[Crim. No. 24182. Nov. 9, 1987.]

In re HERMAN G. MARTIN on Habeas Corpus.

COUNSEL

Charles M. Sevilla and Cleary & Sevilla for Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Michael D. Wellington, John W. Carney and Louis R. Hanoian, Deputy Attorneys General, for Respondent.

OPINION

MOSK, J.—Petitioner Herman G. Martin was convicted of conspiracy to commit extortion (Pen. Code, §§ 182, 518), conspiracy to commit assault with a deadly weapon (*id.*, §§ 182, 245, subd. (a)), assault (*id.*, § 240), and murder in the second degree (*id.*, § 187); he was found to have committed the conspiracy offenses and the murder while armed with a firearm (*id.*, § 12022, subd. (a)). He was sentenced to a prison term of 15 years to life for

the murder with a 1-year firearm enhancement, the sentences for the other offenses being stayed or ordered to run concurrently with the sentence for murder.

Martin petitions for a writ of habeas corpus. He rests his claim to relief on two grounds among others. The first is prosecutorial interference with his constitutional right to present the testimony of witnesses at trial. The second is what may broadly be referred to as the prosecution's introduction of false evidence—specifically, the introduction by the prosecution of false evidence substantially material on the issue of guilt, and the nondisclosure by the prosecution of inducements offered for the testimony of certain witnesses.

To assist this court, we appointed the Honorable Gerald Brown, Presiding Justice of Division One of the Fourth District of the Court of Appeal, Retired, as referee to take evidence and make findings of fact and conclusions of law regarding petitioner's claims. Following a lengthy hearing, the referee filed his report. He determined that the prosecution had indeed interfered with petitioner's constitutional right to present the testimony of witnesses at trial. He also determined that the prosecution had introduced against petitioner false and substantially material evidence and had failed to disclose inducements it had offered certain witnesses for their testimony.

As we shall explain, we adopt the referee's determination that the prosecution interfered with petitioner's right to present the testimony of witnesses, conclude that petitioner has established his claim to relief on that ground, and determine that the appropriate disposition is vacation of the judgment of conviction. Accordingly, we will grant the petition.

## I. PRIOR PROCEEDINGS

### A. *Facts*

On the night of May 12, 1981, Kathleen (Cass) Piascik drove Andrew Powell, who was employed by petitioner at Anear Insurance Company, to 2574 Caminito Muirfield in the Windemere Development in La Jolla to visit Richard Crake. Powell was carrying a briefcase which contained a sample insurance policy and a broken, but not inoperable, revolver. Powell and Piascik reached the Windemere security gate about 8:45 p.m., were let in, and followed a car that turned out to be driven by Crake, who was returning home from an early dinner with his wife Katherine and his daughter, also named Katherine.

After the Crakes entered their home, Powell and Piascik approached and rang the bell; Crake opened the door; Powell identified himself and stated

he was there on insurance business; Crake asked whether the matter could not be handled at his office in the morning; Powell showed Crake a document he was carrying, Crake remarked it was only a sample insurance policy, and Powell sent Piascik back to the car ostensibly to get the proper documents. After Piascik left, Powell and Crake began to argue and were heard by Crake's wife and daughter, who began to approach the front door from other parts of the house. As Crake's daughter descended the stairs from the second floor, Crake tried to shut the door on Powell; Powell, however, overpowered him and entered the house. The men fought. Powell struck Crake on the head with the gun several times and shot him in the arm.

Having arrived at the scene of the struggle by this time, Crake's wife hit Powell and attempted to stop his attack. Powell lost control of the gun, and the weapon landed on the other side of the room. As he went to retrieve it, Mrs. Crake pushed him, he pushed her back, she fell to the floor, and he picked up the gun and shot at her but missed. Meanwhile, Crake's daughter had been throwing books and shoes at Powell from the stairs. She succeeded in hitting him in the head with her wooden clogs. Apparently staggered by the blows, Powell, who was by now covered with blood, backed out of the house, ran to the car, and was driven away by Piascik. Crake died later that same evening as a result of the injuries he sustained in Powell's attack.

On May 13, 1981, Powell was arrested. He was charged with murdering Crake and with assaulting Mrs. Crake with a deadly weapon. On September 2 and 15, 1981, he made statements to the San Diego District Attorney's office. In those statements he claimed that in doing what he did, he was acting as petitioner's agent.

### B. *Pretrial and Trial*

Evidently on September 15, 1981, as a result of Powell's statements, petitioner was arrested. Charged with conspiracy to commit extortion, conspiracy to commit assault with a deadly weapon, murder, and assault with a deadly weapon, he pleaded not guilty.

Prior to trial petitioner moved to exclude from the prosecution's case-in-chief any evidence that might show he was a federally protected witness. As the record on habeas corpus reveals, petitioner had been a volunteer operative for the federal government, and had spearheaded an undercover operation to penetrate organized crime's infiltration of certain legitimate businesses on the East Coast; as a result of his participation in this operation he entered the Federal Witness Relocation Program, and he and his family were provided with a new identity and were relocated. In response to the

motion, the court instructed the prosecutor, James D. Pippin, not to "go . . . in detail" into petitioner's status as a federally protected witness in his opening statement. It also instructed him, in effect, to introduce evidence on the point only to the extent necessary.

Trial commenced on February 24, 1982. The sole question seriously at issue was not what Powell did on the night of May 12, 1981, but on whose behalf he acted. Even before trial began it was apparent that Powell's testimony would be crucial: as prosecutor Pippin stated during pretrial proceedings, "[Powell's] credibility is what this case is going to be all about."

It was the prosecution's theory that petitioner had a motive to harm Crake, directed Powell to Crake's home on the night of May 12, 1981, to at least threaten harm, and thereby initiated the chain of events that ended in Crake's death. Specifically, the theory was as follows: for almost four years, petitioner had been embroiled in civil litigation with Crake, claiming that Crake had defrauded him of $100,000 in a real estate transaction in San Diego; by the end of April 1981, the litigation had reached a critical stage and presented petitioner with undesirable options; facing such a situation, petitioner sent Powell to "strong arm" Crake and "collect" the $100,000 "debt"; Powell confronted Crake, Crake resisted, Powell beat him, and Crake died as a result of the blows.

In his opening statement, prosecutor Pippin asserted the evidence would show that in spite of the fact that Powell was a murderer, his testimony was worthy of belief. "The evidence is going to show that . . . [Andrew Powell] was prosecuted for the murder of Richard Crake. He has been convicted for the murder of Richard Crake, and the evidence is going to show that it was Mr. Powell's request that he was interviewed by members of the District Attorney's staff, myself included, and that he made a statement that was reported by a court reporter, and that he was going to testify about. He is going to testify why he made that statement, and the evidence is going to show the statement was made not for—not for his benefit, not so that he could get a better deal, not so he could get some favorable treatment for the crimes for which he was being prosecuted, but that his motivation for giving the statement that he gave and that his motivation for testifying as he does is so that everyone responsible for the situation he is in is held responsible. . . . [¶] The evidence will show that at no time was any promise made to him for his testimony or any preferential treatment given him for his testimony."

In attempting to support his theory, the prosecutor presented evidence that falls into two broad categories, viz., evidence that petitioner had a

motive to harm Crake (the motive evidence) and evidence that he instructed Powell to "strong arm" Crake and "collect" the $100,000 "debt" (the agency evidence).

The story the motive evidence tells was generally not disputed by petitioner. It runs in substance as follows.

On June 8, 1977, petitioner filed a complaint with the San Diego District Attorney, accusing Crake of defrauding him of $100,000 with regard to the real estate transaction in San Diego. On August 31, 1977, petitioner filed an action for damages in the San Diego Superior Court against, among others, Crake, developer George Friehl, and Friehl's wife Georgeann (No. 403639). He alleged that the defendants had fraudulently induced him to guarantee a $100,000 loan, and sought $100,000 in principal and $50,000 in accrued interest as compensatory damages and $1 million in punitive damages. In October 1977 petitioner mentioned his dispute with Crake to Investigator John Armstrong of the San Diego District Attorney's office.

During the pendency of petitioner's lawsuit, Crake filed a collusive action in Riverside Superior Court against the Friehls's interest in the San Diego property. The Friehls did not appear. A default judgment was entered against them, and their interest in the property was expunged and transferred to Crake.

On December 28, 1977, Crake and the other defendants in case No. 403639 filed a cross-complaint alleging that petitioner's "loan" was usurious. The cross-complainants asked for general and punitive damages in the sum of $1 million.

On April 11, 1978, petitioner again spoke with Investigator Armstrong about Crake and asked Armstrong to intercede in his behalf. Pursuant to his request, Armstrong spoke with Deputy District Attorney Robert O'Neil. After speaking with O'Neil, Armstrong told petitioner that if he wished the district attorney to pursue the matter, he would have to answer some questions about his background and agree to testify at trial. Petitioner became angry and refused to answer any questions about his background, expressing a fear for his safety if certain information about him became known.

On November 8, 1978, petitioner complained about Crake to Deputy District Attorney Charles Hayes. Hayes told petitioner that he had interviewed Crake and had been given certain information about his background. Hayes asked petitioner whether the information was true, specifically, whether he had "connections" with the United States Department

of Justice. Petitioner responded he had such "connections."[1] Hayes said he would have to answer some questions truthfully about his background before there would be an investigation. Petitioner refused. Hayes said he would not proceed to court with a witness who was not fully candid with him. Petitioner then left.

On December 15, 1978, petitioner filed a quiet title action in San Diego Superior Court regarding the property (No. 427117). Crake filed a cross-complaint originally seeking $1 million in punitive damages from petitioner and his attorneys.

In case No. 403639—the original litigation concerning the San Diego property—Crake personally took the deposition of petitioner. In the course of the deposition petitioner refused to answer certain questions about his background. Crake thereafter moved to compel answers to those questions.

On February 22, 1979, and March 6, 1979, Crake took the deposition of petitioner in an American Arbitration Association case. In the course of the deposition, petitioner refused to answer questions about his background. Petitioner called Crake "devious" and said he was "driving" him to "an act of violence." He said: "I can live with a bad investment. I cannot live with guys who try to beat me. I will not be beaten under any circumstance, no matter what the consequences are." He also said that when "a man loses control of himself, anything can happen," and that "it would be my pleasure" to physically beat Crake "as leverage," "as the way we ought to stop any losses with you." To clarify his previous statement, petitioner said: "You were intimating that I had in fact hired somebody for some other violence, and I am simply stating that, if it came between you and I, I wouldn't hire anybody."

On September 14, 1979, the court entered an order in case No. 403639 compelling petitioner to answer Crake's deposition questions about his background. In mid-April 1981—after a long delay attributable to petitioner's poor health—the deposition was scheduled for May 18, 1981.

On April 18, 1981, petitioner asked Assistant United States Attorney Robert Noel for his assistance in concealing his background at the forth-

---

[1] After he said in the course of his testimony that petitioner admitted his Justice Department "connections," Hayes volunteered the following statement in the absence of a question: "I asked him whether he was acquainted with the Mafia activities in New Jersey, and he said —." At this point defense counsel, John A. Mitchell, objected and moved for a mistrial. In a bench conference, the court denied the motion but directed prosecutor Pippin to "[s]traighten out his witness." It then sustained the objection, instructed the jury to disregard Hayes's statement, and struck the statement from the record.

coming deposition. Petitioner said that if he was forced to answer Crake's questions he would have to commit perjury.

As a consequence of the order compelling him to answer Crake's questions concerning his background, petitioner was left with three options: refuse to answer and run the risk of involuntary dismissal of his action as a sanction for his refusal; disclose the information and jeopardize his safety; and answer the questions falsely.

Crake was killed on May 12, 1981—just six days before the scheduled deposition.

Unlike the motive evidence, the agency evidence presented by the prosecution was vigorously disputed by petitioner. The only direct evidence that Powell was acting on petitioner's behalf on the night of May 12, 1981, was provided by Powell himself.

In August 1980, Powell testified, he was introduced to petitioner by Michelle Goff, who was Powell's roommate and lover. She worked for petitioner's firm, Anear Insurance Company. Around March 23, 1981, he went to work for the company; his job involved general office duties. At that time he was experiencing difficulty in making child-support payments, and believed that "if I were unable to make the payments, because I had been to court several times for this, that I would probably end up doing some time in custody, a couple of years in custody."

About April 3, 1981, as he and Goff were riding in petitioner's Cadillac, petitioner asked whether he had "guts." He replied in the affirmative. Petitioner then said, "Well, maybe we will see one day. I will see."

On April 6, 1981, petitioner reminded him of their April 3 conversation and asked whether he had ever heard of Richard Crake. He said he had not. Petitioner then stated that Crake was "no good," had "swindled and bothered a lot of people," and was "a no good son of a bitch"; he added that he had some dealings with Crake, that Crake owed him some money in connection with a real property transaction, and he was having difficulty collecting the debt. When Powell asked him why he was telling him about Crake, petitioner responded that he wanted him to see Crake to try to collect the money.

On April 7, 1981, Powell continued, petitioner asked whether he had thought about their conversation of the previous day. He said he had, but added he could not understand why he wanted him to get involved in the matter. Petitioner let him know he was aware of his child-support problems,

and stated that if he wanted to keep his job and stay out of jail, he would listen to what he had to say. Petitioner then said "he wanted me to go to Richard Crake and try and collect $100,000, tell him that he wanted $100,000 that was owed to him, and he wanted me to beat him up." Powell became angry, asked, "Why me?" and stormed out of the office.

On April 10, 1981, petitioner showed Powell a photograph in which Crake and five other persons appeared. Powell had never seen Crake before. Petitioner tore off the portion showing Crake and gave it to him. Petitioner said he could contact Crake at his office in downtown San Diego, but he replied he would not go to Crake's place of business. Petitioner then ended the conversation by stating that he would get Crake's home address. When Powell went home that evening, he put the photograph in a dresser drawer.

On April 13 or 14, 1981, petitioner dictated to Powell what he believed to be Crake's home address, 6039 Caminito de la Costa, which was near the beach in La Jolla. He told Powell that he should be careful because Crake was "such a shady character that he probably had body guards." He also said that Powell, who was Black, "would probably stick out like a sore thumb" in the neighborhood, which was predominantly White.

For more than a week following this conversation, Powell continued, he did nothing in the hope that petitioner would forget about the matter. But petitioner then reminded him of their earlier discussion about his child support problems, threatened he would "blackball" him from employment in San Diego, and asked "when I was going to take care of business . . . ." On cross-examination, however, Powell admitted that on April 13, 1981, he had appeared in court on the child support matter and resolved the past difficulties.

On April 29, 1981, Powell drove to the beach area and located the house he believed to be Crake's at 6039 Caminito de la Costa. Around that date, he met Kathleen ("Cass") Piascik, who was trying to obtain a job at Anear Insurance.

About 6 p.m. on Friday, May 8, 1981, Powell continued, he again went to the Caminito de la Costa address. This time, however, he took Piascik, telling her he was going there to do some insurance business for petitioner. He took Piascik, who was White, "for easy access to—into the area." They approached the front door of the house at 6039 Caminito de la Costa and rang the bell, but there was no answer. They went next door and a woman answered; he asked for the Crakes, but she said they had moved to the Windemere Development in La Jolla. He returned home about 7:30 p.m. Later that night he called petitioner and told him "that the address he had

given me was the wrong address and that we had problems, that he almost got me in trouble, and that was it."

On Monday, May 11, 1981, Powell had two meetings with petitioner. At the first petitioner asked Clyde Harless, the owner of Corey Insurance, about Windemere, and Harless made some response. Petitioner, Powell said, was in the process of buying Corey Insurance, and had already obtained some of that company's records. Petitioner also made some inquiry to Michelle Goff apparently about Corey Insurance documents relating to Windemere. After his exchange with Harless, petitioner made a telephone call and obtained the address at 2574 Caminito Muirfield. He then dictated the address to Powell, and the meeting ended.

Later that day, petitioner and Powell met for a second time. At that meeting, Powell said, "He gave me the keys to his car and told me to go down to the car, that a friend of ours had left a—left something for us in the car." Powell went down to the car, found a brown bag inside a box in the trunk, determined that it contained a gun, and put the bag in Michelle Goff's vehicle, which he was using at that time. He then returned the keys to petitioner and asked, "was that necessary[?]" Petitioner said it was, and reminded him that Crake "probably has bodyguards" and "it is for your own protection." With that statement, apparently, the second meeting ended. Later that day Powell called Piascik to arrange to meet on the following day.

On May 12, 1981, Powell continued, he told Piascik he had some insurance business to take care of with Crake and asked her to drive him to Crake's house in Windemere; she agreed. She picked him up that night; he carried a briefcase in which he had placed a manila folder containing a sample insurance policy and the gun he had allegedly obtained from petitioner. On the way to Windemere, he told Piascik he was going to Crake's home on petitioner's behalf to talk with him about petitioner's $100,000 and to beat him up. He then asked whether that fact "ma[d]e her nervous, you know, did she want to back out under those circumstances." She said, "No."

Powell then described the events immediately preceding his encounter with Crake, the encounter itself, and the events following. Although less unfavorable to him than the facts as stated above, his description is not substantially different.

When he returned home to the apartment he and Michelle Goff shared, Powell continued, he changed his blood-stained clothes and cleaned himself up; Goff was not there. He then called petitioner and told him that "his

dirty work had been done." Later that night, Goff returned. Accompanied by her, he threw away the jacket he had worn and wrapped the gun in a plastic bag and placed it in a dumpster. He and Goff then went to pay a social visit on a friend, Maria Pulido. The next morning he was arrested.

At the end of direct examination, Powell effectively denied that he had received any inducements from the prosecution to testify. To the question posed by prosecutor Pippin, "Do you have any—is your testimony here based on any motivation that it is going to benefit you in any way?" Powell responded, "No, sir."

Although Powell's testimony constituted the only direct evidence that he was acting as petitioner's agent on the night of May 12, 1981, it was not the only evidence tending to establish the fact.

To begin with, Powell's story was corroborated directly or indirectly by the testimony of other witnesses. In general, Kathleen Piascik described the events in which she was involved much as Powell had described them. But she also gave the following testimony on direct examination.

"[BY MR. PIPPIN:] Q. On the way to Windemere, did [Powell] tell you that he was going there because Herman Martin had sent him? [¶] A. No. [¶] Q. Did he tell you he was going to beat somebody up? [¶] A. No. [¶] Q. Did the two of you have a conversation about whether or not he wanted to do this and whether or not he should do it? [¶] A. Whether he should beat someone up? [¶] Q. Yes. [¶] A. No, absolutely not. [¶] Q. Had anything been said that led you to believe anything illegal or unlawful was going to take place? [¶] A. No."

Michelle Goff testified that sometime in mid-to late April 1981 petitioner said "he was going to fire Andrew Powell for not taking care of business." On cross-examination she stated that in April or May of that year Powell said jokingly that petitioner "wanted [him] to kick someone's rear end or words to that effect." She further testified on direct examination that on either May 8 or 11, 1981, while petitioner was meeting with Powell in his office, he asked whether she had a homeowner's list for the residences at Windemere. She also recalled that on the night of May 12, 1981, Powell placed a plastic bag containing an item unknown to her in a dumpster.

Goff further testified that on May 13, 1981, petitioner called his attorney, Leslie Osborne, told him "the boyfriend of one of his employees had a problem," and asked for a referral; she then got on the telephone, described the situation Powell found himself in, and was referred to Nelson Brav; she spoke with Brav but never discussed a fee; on May 15, 1981, petitioner told

her Brav wanted a $5,000 retainer and $100 an hour. As the evidence reveals beyond genuine dispute, the following week Brav brought Powell a check in the amount of $17,500 to endorse; the check was drawn on the account of Osborne's law firm and signed by Osborne; Osborne never talked with Powell, did not owe Powell any money, and was never paid back by Powell. The record on habeas corpus establishes that petitioner's wife lent Powell the money.

On cross-examination, however, Goff gave testimony that tended to undermine the truth of Powell's story. First, she stated she believed Powell was a liar. Second, she said that she had never seen a picture in any dresser drawer in the apartment she and Powell shared, and specifically that she had never seen the photograph of Crake described by Powell in his testimony. Third, she stated that when she asked Powell why he had taken Piascik with him on the night of May 12, 1981, "he told me because Cass knew Crake and they had business dealings."

Maria Pulido testified that Powell and Goff paid her a social visit late the night of May 12, 1981. She stated that around 7 or 8 a.m. on May 14, 1981, Powell called her from jail. During their conversation he said words to the effect that "Cass was with him that night and that, it is not fair that she is released and he is in custody."

James Murphy, who was employed as a Deputy United States Marshal at the time of the killing and was evidently a friend or close acquaintance of petitioner, testified in part as follows. On May 11, 1981, petitioner asked him to obtain Crake's address and telephone number. To prosecutor Pippin's question, "Did he say what he wanted it for?" he responded, "Had something to do with Crake's lawsuit. He was trying to serve some papers in the Crake lawsuit, and somehow I—it just had something to do with the Crake lawsuit." Between 3 and 4:30 p.m. that same day, Murphy said, he obtained the address, called petitioner at his office, and gave it to him.

On May 13, 1981, Murphy continued, he called petitioner and said they had to talk: he knew that Crake had been killed and that Powell had been arrested. Petitioner invited him to his office. At this point, the following colloquy ensued.

"[BY MR. PIPPIN:] Q. Did you talk to Mr. Martin about the time that you had given him Crake's address shortly before Crake was killed? [¶] A. Yes. I was concerned about that. [¶] Q. What did he say in response to your concern? [¶] A. He told me that he was concerned about my job. You know, that the fact that I had come in there from the agency, and he was also concerned about the fact that he might be considered as a suspect because of

statements that he had made, prior statements that he had made in a civil litigation that they had going on.

" . . . . . . . . . . . . . . . . . .

"Q. What did he tell you—did he say something about Mr. Powell? [¶] A. Yes, he did. [¶] Q. What did he say? [¶] A. He said that he had sent Powell out to, or that Powell had gone out to serve some papers or in the Crake lawsuit or whatever. And that he was—apparently Powell had gotten in an altercation with Crake, because Crake had probably called him a nigger or something, and Powell was very high-strung and probably, I don't know, beat him or whatever. I don't know. [¶] Q. That is what Martin said probably happened; is that right? [¶] A. Right. [¶] Q. So he did tell you he sent Powell out to Crake's house? [¶] A. Right. Okay. Yes."

Clyde Harless, the owner of Corey Insurance, testified that on May 13, 1981, petitioner told him and two other persons during a discussion of the Crake killing: "Yes, I heard about the incident. He owes me some money. I expect the police here any minute." About two days after the killing, Harless stated, "Mr. Martin asked me if I knew bail procedures. And I said, 'No.' He said 'Well, if the bail for Andy Powell is not too high, I will put my home up as collateral for bail.'"

Finally, Steven Jarrett, who was a trusty in the San Diego County jail at the time petitioner was in custody, testified to a statement petitioner allegedly made to him "He told me that the case was more or less a big mess, and there was two Black inmates in the jail that were friends or associates of Mr. Powell's and that it could all be cleared up if these two guys would testify in his behalf that they gave or sold Mr. Powell the gun and that he would give them both $5,000 and bail them out if they would do this. I don't know who these two guys were."

Jarrett was then called on to explain when he had first made the substance of this conversation known to the prosecution and the circumstances under which he had done so. The following colloquy is relevant.

"[BY MR. PIPPIN:] Q. When did you make this information known? [¶] A. Last Monday. [¶] Q. What caused you to make it known last Monday? [¶] A. I am at M.C.C. [i.e., the federal Metropolitan Correctional Center in San Diego], and I am segregated from everyone, and they have to take me to court separate from everybody else, and Mr. Powell, who I didn't know that was him at the time, they had—he is—you know, in the same situation more or less, and they called my name. I was in one cell, and he was in another cell to be taken to court. They called both our names, and they

chained us up and put us in the Sheriff's van to bring us over here. I asked him, 'Are you the one involved in the Martin case?' And he said, 'Yes.'

". . . . . . . . . . . . . . . . . ."

"Q. you first met Mr. Powell a week or so ago? [¶] A. Last Monday on the way to court here."

Jarrett admitted that he was then in custody facing charges, and that he had suffered two or three convictions for theft-related felonies. But to prosecutor Pippin's question, "Had you been made any promises for leniency or any favorable treatment for giving your testimony?" Jarrett responded, "None."

Powell's testimony was corroborated not only by the testimony of other witnesses but also by undisputed evidence of the sequence of events leading up to and immediately following the killing of Crake—especially telephone calls made from Powell's home to petitioner's on May 8, 1981, and May 11, 1981. Specifically, at 9:24 p.m. on Friday, May 8, 1981—after Powell and Piascik had allegedly gone to Crake's former address at 6039 Caminito de la Costa in La Jolla—a telephone call, which lasted 60 seconds or less, was placed from Powell's home to petitioner's. On Monday, May 11, 1981, petitioner sought and obtained Crake's new address from Murphy. Around 9 p.m. on Tuesday, May 12, 1981, Powell subjected Crake to the attack that would result in his death. At 9:51 p.m. a telephone call, which again lasted 60 seconds or less, was placed from Powell's home to petitioner's.

After the prosecution rested, the defense moved for judgment of acquittal under Penal Code section 1118.1 on the ground of insufficiency of the evidence. In denying the motion, the trial judge, Donald W. Smith, observed that the testimony of Powell was crucial. "I suspect, if [the jury] didn't find [that there is sufficient evidence, independent of Powell's testimony, to connect petitioner to the crimes], they wouldn't convict him, because obviously, the People are relying on the murderer as their chief tie-down witness. *If they don't believe him—they are not going to convict [petitioner].*" (Italics added.)

The defense theory was that on the night of May 12, 1981, Powell acted on his own and not as petitioner's agent. The theory rested in substance on two bases. The first was that Powell's story implicating petitioner was in part inherently unbelievable and in part demonstrably false. The second was that Powell or at least Piascik had had some independent dealings—perhaps drug dealings—with Crake, and that the pair went to Crake's home on the night of May 12, 1981, to conduct their own business.

Called as the first witness on behalf of petitioner, Stephen Aguilar testified in part as follows. While working together as salesmen at Harrison Buick in National City in 1979 or 1980, he and Powell became friends. Around March 9, 1981, Powell called him in the morning at Harrison Buick and asked whether he would like to make $1,000; he answered yes; Powell, however, did not expand on his offer. On May 11, 1981, Powell again called him at Harrison Buick and again asked whether he would like to make $1,000; this time, however, he asked whether he could get him an "unmarked gun"; Aguilar answered, "Sure," and asked no questions. About 1 or 1:30 p.m. that same day, Powell came by Harrison Buick in a Cadillac. Powell drove Aguilar to his apartment; Aguilar went in to get the gun—a loaded Blackhawk .357 magnum revolver that was "missing the two decals on both sides and the little clipping on the cylinder"; he came out with the gun in a brown paper bag, and handed it to Powell; Powell placed the gun in the trunk, then drove him back to Harrison Buick.

About 8:30 a.m. on May 13, 1981, Aguilar continued, Powell again called him at Harrison Buick and asked him to come to his apartment and pick up the gun. He got to Powell's home about 9 or 9:30 a.m. Powell went into his garage, returned with the gun in a brown paper bag, told him he had washed it with soap and water, and promised to pay the $1,000. He asked, "What happened? What did you use it for?" Powell replied, "You will see it in the newspaper." Aguilar took the gun, returned home, and left the weapon in his apartment.

On May 14, 1981, Aguilar learned about Crake's murder and Powell's arrest and became worried. He kept the gun in in his apartment for a week or so and then disposed of it one night in a dumpster behind the Food Basket market in National City.

On cross-examination, Aguilar was asked about the source of the gun. The following colloquy is relevant.

"[BY MR. PIPPIN:] Q. Where did you get the gun from? [¶] A. From a friend. [¶] Q. Who? [¶] A. I would rather not say. [¶] Q. I don't care if you would rather not say. Who did you get the gun from? [¶] A. I would rather not say.

"MR. PIPPIN: YOUR Honor, would you direct the witness to answer the question?

"THE COURT: YOU are directed to answer the question. Do you understand that?

"THE WITNESS: YES, sir.

"THE COURT: FINE. Answer the question.

"THE WITNESS: A gentleman by the name of Charles Riley.

"BY MR. PIPPIN: Q. Charles Riley? [¶] A. That's correct. [¶] Q. Where does Charles Riley live? [¶] A. In the same complex that I live in."

As the record on habeas corpus establishes, this testimony constituted the first information either party received concerning the existence of Charles Riley and his possible involvement in the case.

As the cross-examination continued, Aguilar revealed that he knew Riley had a handgun and a shotgun; after he spoke to Powell on the telephone on the morning of May 11, 1981, he asked Riley whether he could borrow his revolver, and said he would pay him $300 when he received the money he was to get; Riley asked, "What is it for?" and he answered, "I have no idea"; Riley then accepted the offer and gave him the gun; sometime after May 12, 1981, Riley came to believe his gun had been used in the Crake killing and advised Aguilar to throw it away; he then demanded the $300 Aguilar had promised, Aguilar unsuccessfully attempted to raise the money, and Riley took Aguilar's reel-to-reel tape deck in its place.

Immediately after he left the stand and passed through the courtroom doors, Aguilar was arrested in the hallway as an accessory to murder by prosecution investigator Lawrence K. Wilson. The arrest took place in the presence of prospective defense witnesses Michelle Goff, Maria Sharpe, and Cynthia Rosenthal, and at least one representative of the press. At the reference hearing Wilson admitted he knew Goff and Rosenthal were present when he made the arrest. The following day, Aguilar was released on his own recognizance on the recommendation of prosecutor Pippin. As the record on habeas corpus reveals, Aguilar was evidently never charged.

Charles Riley was called as a witness for petitioner. The prosecutor had refused Riley's request for immunity; petitioner then unsuccessfully moved the court to grant immunity. In response to defense counsel's question, he gave his name and address and then stated: "I refuse to answer any further questions on the Fifth Amendment." Riley would have corroborated Aguilar's testimony that he was the source of the gun.

Eugene Wallace was also called as a witness for petitioner. The prosecutor again refused a request for immunity and petitioner again unsuccessfully moved the court for a grant of immunity. In response to defense counsel's question, Wallace gave his name. Counsel then asked, "Mr. Wallace, did

you have occasion to meet Andrew Powell?" and Wallace responded, "I respectfully stand on the Fifth Amendment." Wallace would have testified, in part, that while he and Powell were cellmates in the summer of 1981, Powell admitted petitioner was not involved in the killing; he would also have testified that with his help Powell fabricated the story implicating petitioner in the crime.

John Donald Gross was also called as a witness for petitioner. The prosecution again refused a request for immunity and petitioner again unsuccessfully moved the court for a grant of immunity. Except for admitting that he knew Powell, Gross invoked his Fifth Amendment privilege and refused to testify. Gross would have testified that while he and Powell were in jail together in the summer of 1981, Powell admitted petitioner was not involved in the killing; that he also admitted he received the gun from Aguilar; and that with Wallace's help he fabricated the story implicating petitioner.

Cynthia Rosenthal testified that at all relevant times she worked as a receptionist at Anear Insurance. Shortly after Powell came to work for the firm in March 1981, he began to receive telephone calls from Piascik, sometimes as many as two or three a day. About 11:30 p.m. on a day in April 1981, Rosenthal received a call at home from Powell. "He asked if I would like to come over to a person's house—didn't give me a name. Him and Cass were over there, and they were entertaining. He was a prominent attorney, and if I wanted to go over for a social visit. . . . [He] . . . told me where the place was in La Jolla and that I would have to go through security gates in order to get in." Rosenthal also testified that one day at work during April 1981 Powell asked whether she could locate a gun for him.

Called as a witness on petitioner's behalf, Michelle Goff stated that, as Powell had testified, she and Powell rode with petitioner in his Cadillac on April 3, 1981. Asked, "At any time in that conversation in the car was anything said concerning, by Mr. Martin, concerning the guts of Mr. Powell or the manhood of Mr. Powell?" she answered, "No." Asked, "At any time in any conversation when you and Mr. Martin and Mr. Powell had been present, did Mr. Martin ever make any comments like that?" she again answered, "No."

Petitioner's teenaged son testified that between 8 and 10 p.m. on May 8, 1981, the telephone at the family home rang. "I picked up the receiver, said, 'Hello.' The person on the other side said, 'Is Mr. Martin there?' I asked, 'Who is calling?' He said, 'Andy.' I said, No, he is not. He is next door.' He said, Thank you.' I said, 'Goodbye.' "

Marcia Sharpe, petitioner's daughter, testified that at 9:51 p.m. on May 12, 1981—the time at which Powell claimed he called petitioner at home and told him "his dirty work had been done"—she and her husband were dining with petitioner and his wife at a restaurant in Escondido. Sharpe's husband corroborated her testimony. Petitioner presented evidence to show that the 9:51 p.m. telephone call may have been received by his housekeeper, who spoke no English.

Called as a witness on behalf of the defense, James Murphy changed his previous testimony about his May 13, 1981, conversation with petitioner. He testified in part as follows.

"[BY MR. MITCHELL:] Q. First, what did Mr. Martin say as you remember it now? [¶] A. On the 13th? [¶] Q. Yes, sir. [¶] A. He stated that—he called him 'Andy,' that Andy had went to Crake's residence with some papers and apparently there had been an altercation, and he said probably—he said Crake probably called him a nigger or something like that, and Andy was very high-strung and that he probably, you know, started beating on him. [¶] Q. Can you explain for us the difference in your testimony today as compared to the last time you testified? [¶] A. Yes. When I said—when I used the word 'sent,' that Mr. Martin had sent Powell, is because I had assumed that he had sent Powell, because in February or March Martin had called me—"

Because of an objection on the part of the prosecution, Murphy was prevented from completing his answer. If he had been allowed to finish, he would have stated that in February or March petitioner called him for help in serving papers in his litigation with Crake.

On cross-examination Murphy admitted that his previous testimony was consistent with a statement he gave to the prosecution in September 1981 and with his testimony at petitioner's preliminary hearing. He further admitted that he realized his previous testimony needed correction only after he had been queried on the matter by defense counsel.

In his closing argument, prosecutor Pippin attempted to bolster the credibility of Powell. He stated: "[E]ither Herman Martin purchased Aguilar's testimony just like he tried to do the people in the jail, or the State purchased some perjury from Andrew Powell by giving him some breaks, some favor, some deal to come in and testify against Herman Martin, whatever it might be. *He wasn't given any. There is no evidence that he was given any kind of deal for his testimony.*" (Italics added.)

Admitting that "it is real easy to downgrade Andrew Powell and show that he is a liar," Pippin argued that even if Powell's testimony was rejected

out of hand, the other prosecution evidence, including the May 8 and 12, 1981, telephone calls from Powell's home to petitioner's, was sufficient to support a conviction.

At one point in his closing argument Pippin introduced a theme suggested by the cover of a novel entitled The Godfather. He began: "Well, I want to talk about the credibility of some witnesses for a little while, and I am reminded of a popular book that came out a few years ago, and it was also a successful movie; a book called The Godfather. I am reminded of that book, at least, the cover, the cover of that book. I don't know if any of you read it, but the cover of that book has the name on it, and I can't remember exactly what it is. It is either a hand or some figure, and there is strings going down to the words and the name, I think, like a puppet; like a person pulling the strings on a puppet. A vision of the cover of that book came to my mind when some defense witnesses testified in this case." Pippin then proceeded to attempt to show that several important defense witnesses were petitioner's "puppets," and that they gave false testimony at petitioner's direction. Defense counsel did not object.

At another point, Pippin began to develop another theme that had Mafia overtones. He stated: "So, you know it is not hard in a case like this, in any conspiracy case, to run down the credibility of, or the character of, one of the coconspirators. People who conspire together to commit crimes are not decent, good, law-abiding, upstanding people. When one of them gets on the stand and testifies, it is easy to run down their credibility. [¶] Let me give you an example of a guy who has been in the press recently. Jimmy Fratianno. The guy has been a crook all his life. He has been a hit man. Okay? He has testified—"

At this point defense counsel objected and moved for a mistrial. Pippin defended his comment as merely a permissible "argument by analogy." The court denied the motion for mistrial, but instructed Pippin to "leave the analogy alone now."

After deliberating almost 22 hours over 5 days, the jury returned its verdict. It found petitioner guilty of conspiracy to commit extortion and conspiracy to commit assault with a deadly weapon, and found true the allegations that he was armed with a firearm in committing each of those offenses. It also returned a verdict of guilty of murder, determined the crime to be of the second degree, and found true the allegation that he was armed with a firearm in committing the offense. Finally, it found petitioner guilty of simple assault (Pen. Code, § 240)—rather than the charged offense of assault with a deadly weapon—and found the firearm allegation not to be true.

The court sentenced petitioner to a term of 15 years to life on the murder count and added a 1-year firearm enhancement to run consecutively. As to each of the conspiracy counts, it sentenced him to three years and added a one-year firearm enhancement to run consecutively, but ordered the sentence stayed in accordance with Penal Code section 654. Finally, as to the assault count, it sentenced him to six months in county jail to run concurrently with the sentence imposed on the murder count.

### C. *Appeal and Initial Habeas Corpus Petitions*

On appeal petitioner raised several contentions. He claimed, inter alia, that the court erred in refusing to grant immunity to Riley, Gross, and Wallace. He also claimed that prosecutor Pippin engaged in prejudicial misconduct on several occasions. Specifically, he complained that Pippin improperly attempted to link him to the Mafia in his examination of Deputy District Attorney Hayes, in his comments in closing argument referring to The Godfather, and in his remarks in closing argument attempting to analogize the testimony of Powell to the testimony of Jimmy Fratianno. Petitioner also complained that by arresting Aguilar when and where it did the prosecution interfered with his right to present the testimony that Riley, Gross, and Wallace would otherwise have given.

On the eve of oral argument, petitioner filed in the Court of Appeal a petition for writ of habeas corpus together with a motion to consolidate the appeal and the habeas proceeding. He rested his claim to habeas corpus relief on two grounds among others. The first was that the prosecution interfered with his constitutional right to present the testimony of witnesses at trial. He alleged, in substance, that the prosecution intimidated Riley, Wallace, and Gross and thereby drove them from the stand. The second ground was the existence of evidence that was newly discovered and not reasonably discoverable at the time of trial, which undermined the entire prosecution case. He alleged that one Wallace Jackson would testify that with Eugene Wallace's help Powell fabricated the story implicating him in the Crake murder, and that Powell received the gun not from petitioner but from Aguilar. In support of his allegations petitioner attached numerous exhibits, including declarations of Riley, Wallace, Gross, and Jackson. The exhibits also included official documents purporting to show the existence of inducements that the prosecution offered Powell and Jarrett for their testimony.

After consolidating the appeal and the habeas corpus proceeding, the Court of Appeal affirmed the judgment and denied the writ. (*People v. Martin* (1983) 150 Cal.App.3d 148 [197 Cal.Rptr. 655].) As to the contentions on appeal the Court of Appeal held that prosecutor Pippin did not

engage in prejudicial misconduct. Specifically, with regard to his apparent attempt to link petitioner with the Mafia in his examination of Deputy District Attorney Hayes, the court observed that on defense objection the question and answer were stricken, the prosecutor was admonished, and the jury was instructed not to consider material stricken from the record, and then concluded: "We assume the jury understood and applied this instruction." (*Id.* at p. 166.) On Pippin's reference in closing argument to The Godfather, the court reasoned, "Even though the illustration was unnecessary and may have been offered in bad faith, it does not amount to a dishonest act or an intent to persuade the jury by deceptive, reprehensible means. [Citation.] Furthermore, in order to preserve this argument on appeal an objection must be made when the comment is made in order to give the trial judge an opportunity to cure any harm caused by the comment. [Citation.] No such objection was made here and an admonishment could have cured any potential prejudicial effect of the illustration." (*Id.* at pp. 166-167.) As to Pippin's comment in closing argument attempting to analogize the testimony of Powell to that of Jimmy Fratianno, the court stated: "This incomplete analogy was abandoned after a bench conference and this limited comment could not in any way have affected the verdict . . . ." (*Id.* at p. 167.)

The Court of Appeal also held that the prosecution did not interfere with petitioner's right to present the testimony of Riley, Wallace, and Gross. "In this case there is no offer of proof nor [*sic*] evidence the witnesses' decision to not testify was based on any conduct attributable to the state . . . . Without conduct attributable to the prosecution there cannot be any wilful suppression of evidence." (*Ibid.*)

As to the habeas corpus petition, the Court of Appeal held that petitioner's claim that the prosecution interfered with his right to present the testimony of Riley, Wallace, and Gross "ha[d] been dispensed with on the merits in the opinion on appeal. [Citation.] A potential witness' assertion of the Fifth Amendment privilege against self-incrimination is not conduct attributable to the prosecution." (*Id.* at p. 168.)[2]

The Court of Appeal also held that prosecutor Pippin had indeed "suppress[ed] . . . substantial material evidence concerning the credibility of chief witnesses": Powell and Jarrett had been offered inducements for testimony; not only had the prosecutor failed to disclose the fact, but he also failed to correct the witnesses' misleading testimony denying promises of lenient treatment, and even argued that "There is no evidence that [Powell]

---

[2] It appears that in coming to this conclusion the Court of Appeal either failed to consider the relevant declarations or reasoned impliedly that a witness's assertion of his privilege against self-incrimination can never be attributable to the prosecution.

was given any kind of deal for his testimony." (*Id.* at p. 169.) But Pippin's misconduct, the court concluded, was not prejudicial: "We are satisfied that had the jury known the witnesses had been promised more lenient treatment in exchange for their cooperation, it would not have affected the verdict." (*Ibid.*)

Finally, the Court of Appeal held that petitioner's newly discovered-evidence claim failed. "None of the information supplied by Jackson's declaration constitutes evidence undiscoverable before trial. Both Jackson's and Wallace's declarations state they were cellmates along with Richard Tiebout and Powell during the defense investigation. The defense investigator interviewed Wallace and Tiebout and could just have [*sic*] easily interviewed Jackson. No new evidence which would have undermined the prosecutor's case is presented and the potential witness was discoverable before trial." (*Id.* at p. 170.)

Petitioner applied for a writ of habeas corpus in this court. In that petition he made allegations, advanced arguments, and presented exhibits substantially similar to those of his petition to the Court of Appeal, but with a number of additions. The petition was denied.

## II. THE PRESENT PROCEEDING

### A. *Procedural History*

On November 20, 1984, petitioner filed his petition in this proceeding. He rests his claim to relief on two broad grounds among others. The first involves prosecutorial interference with his constitutional right to present the testimony of witnesses at trial—specifically, the testimony of Charles Riley, Eugene Wallace, and John Gross. The second involves the introduction by the prosecution of false evidence, which includes both the introduction of false evidence properly so-called—specifically, the testimony of Andrew Powell—and the nondisclosure of inducements offered to Powell and Steven Jarrett. In support petitioner makes allegations similar to but substantially more specific than those of his earlier petitions. Attached to the petition are numerous exhibits. Many of these—including the declarations of Charles Riley, Eugene Wallace, John Gross, and Wallace Jackson—were attached to the previous petitions; several additional and more recent exhibits, however, are also attached.

██ We issued an order to show cause.[3] The Attorney General filed a return denying the allegations of the petition. He argued in essence that it was petitioner's theory that the prosecution had entered into an elaborate conspiracy with Powell to convict a man it knew to be innocent, and that such a theory was inherently absurd. He also argued that the evidence presented by petitioner in support of his claim was obtained by money and threats. In his traverse, petitioner denied the allegations of the return, disclaimed reliance on a "conspiracy" theory, and denied he had obtained his evidence by either money or threats.

On September 30, 1985, we appointed the Honorable Gerald Brown to take evidence and make findings of fact and conclusions of law responsive to the following questions raised by the petition: (1) Did prosecutorial misconduct interfere with petitioner's right to present the testimony of witnesses at trial? (2) Was false evidence, substantially material or probative on the issue of guilt, introduced against petitioner at trial?

The reference hearing opened on November 25, 1985, and closed on May 6, 1986. Before the referee by stipulation of the parties were the record of the trial and a number of documentary exhibits. The record of the evidence and argument presented at the hearing fills 26 volumes and totals nearly 5,400 pages.

After the hearing the referee filed a lengthy and detailed report. To the first question, "Did prosecutorial misconduct interfere with petitioner's right to present the testimony of witnesses at trial?" the referee gave the following answer: "Yes. Petitioner's evidence as well as the evidence presented by respondent establishes intimidation of defense witnesses Charles Riley, Eugene Wallace and John Gross. Petitioner's evidence was credible and established witness intimidation. [¶] As a result of this intimidation, none of these witnesses testified for the defense at trial although they had been subpoenaed to petitioner's trial and were initially willing to testify. . . . [T]hese witnesses would have been petitioner's most important defense witnesses by either impeaching Andrew Powell or by demonstrating Powell's fabrication of his story and his motivation for doing so."[4]

In giving this answer to the first question, the referee made a number of specific determinations, including the following. Initially, he concluded that

---

[3] It is, of course, the rule that a petition for habeas corpus based on the same grounds as those of a previously denied petition will itself be denied when there has been no change in the facts or law substantially affecting the rights of the petitioner. (*In re Miller* (1941) 17 Cal.2d 734, 735 [112 P.2d 10].) In this case, however, new facts are alleged in the petition and supported by exhibits of recent date.

[4] In our quotations from the referee's report we omit citations to the record and footnotes.

the prosecution's arrest of Stephen Aguilar immediately after he finished testifying on petitioner's behalf and in the presence of defense witnesses was improper insofar as petitioner's constitutional right to present testimony at trial was concerned. He next found that the prosecution had improperly threatened to charge Charles Riley with any crimes that his testimony might reveal, and that these threats, along with his knowledge of Aguilar's arrest, caused Riley to refuse to give substantive testimony on petitioner's behalf. The referee made a similar finding with regard to Eugene Wallace. He also found that John Gross refused to give substantive testimony on behalf of petitioner because he feared prosecutorial retaliation in a case then pending against him as a result of the arrest of Aguilar, the threats made to Wallace specifically, and the prosecution's general attitude of hostility toward defense witnesses.

To the second question, "Was false evidence, substantially material or probative on the issue of guilt, introduced against petitioner at trial?," the referee gave the following answer: "Yes. Andrew Powell lied at petitioner's trial. Among other things, he received the gun he used to beat Richard Crake to death from Ste[ph]en Aguilar and not, as he lied, from Martin. Powell lied at trial by concocting a story implicating Martin."

In giving this answer to the second question, the referee made a number of specific determinations. At the threshold, the referee found that Powell was a liar by nature: "Untruthfulness is a major component of Mr. Powell's character." He found that while in jail awaiting trial Powell fabricated his story implicating petitioner in the Crake murder with the assistance of Eugene Wallace and one Arthur Swait. He also found that Powell obtained the murder weapon not from petitioner, but from Stephen Aguilar who had himself obtained it from Charles Riley. The referee further found that the prosecution offered Powell and Steven Jarrett inducements for their testimony, but failed to disclose such inducements. Finally, he found that Kathleen Piascik lied at petitioner's trial when she testified that she had no notion anything unlawful was about to happen as she drove Powell to Crake's home on the night of May 12, 1981.

### B. *Merits of the Petition*

Petitioner contends that he is entitled to relief on habeas corpus on each of two grounds: interference on the part of the prosecution with his constitutional right to present the testimony of witnesses at trial, and the introduction by the prosecution of false evidence.

In a habeas corpus proceeding, "The burden of proof is, of course, on the petitioner for the writ . . . ." (*In re Riddle* (1962) 57 Cal.2d 848,

852 [22 Cal.Rptr. 472, 372 P.2d 304], and cases cited.) "In order to secure habeas corpus relief, petitioner must allege and prove all the facts upon which he relies to overturn the judgment." (*In re Hawley* (1967) 67 Cal.2d 824, 829 [63 Cal.Rptr. 831, 433 P.2d 919], fn. 3, and cases cited; accord, *In re Riddle, supra,* at p. 852.) As we shall explain, we conclude that petitioner has carried his burden on the witness-intimidation ground and hence that he has established his right to relief. Accordingly, we do not address the false-evidence ground.

## 1. *The Law*

Under the Sixth Amendment to the United States Constitution, a criminal defendant has the right "to have compulsory process for obtaining witnesses in his favor." Giving meaning to the words of the provision is the Framers's original intent that "the defendant must have a meaningful opportunity, at least as advantageous as that possessed by the prosecution, to establish the essential elements of his case." (Westen, *The Compulsory Process Clause* (1974) 73 Mich.L.Rev. 71, 95.)

In *Washington* v. *Texas* (1967) 388 U.S. 14 [18 L.Ed.2d 1019, 87 S.Ct. 1920], the United States Supreme Court clearly recognized the importance of the compulsory-process right. "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." (*Id.* at p. 19 [18 L.Ed.2d at p. 1023]; accord, *Webb* v. *Texas* (1972) 409 U.S. 95, 98 [34 L.Ed.2d 330, 1023, 93 S.Ct. 351] (per curiam).)

As the high court declared in *Chambers* v. *Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038], "Few rights are more fundamental than that of an accused to present witnesses in his own defense." (*Id.* at p. 302 [35 L.Ed.2d at p. 312]; see also *Faretta* v. *California* (1975) 422 U.S. 806, 818 [45 L.Ed.2d 562, 572, 95 S.Ct. 2525] [holding that "The rights to notice, confrontation, and compulsory process" are "basic to our adversary system of criminal justice"].) Indeed, as the *Washington* court held, "the right of an accused to have compulsory process for obtaining witnesses in his favor, guaranteed in federal trials by the Sixth Amendment, is so fundamental and essential to a fair trial that it is incorporated in the Due Process Clause of the Fourteenth Amendment." (388 U.S. at pp. 17-18 [18 L.Ed.2d at p. 1022].)

The right to compulsory process is independently guaranteed by the California Constitution. In the words of article I, section 15, "The defendant in a criminal cause has the right . . . to compel attendance of witnesses in the defendant's behalf . . . ." In light of the similar language in which they are couched, the state constitutional right must be deemed to be at least as broad and fundamental as the federal.

■ A defendant's constitutional right to compulsory process is violated when the government interferes with the exercise of his right to present witnesses on his own behalf. (*People* v. *Warren* (1984) 161 Cal.App.3d 961, 971 [207 Cal.Rptr. 912]; *Berg* v. *Morris* (E.D.Cal. 1980) 483 F.Supp. 179, 182.)[5]

Governmental interference violative of a defendant's compulsory-process right includes, of course, the intimidation of defense witnesses by the prosecution. (E.g., *People* v. *Warren, supra,* 161 Cal.App.3d at pp. 971-976; *People* v. *Bryant* (1984) 157 Cal.App.3d 582, 587-594 [203 Cal.Rptr. 733]; *United States* v. *Morrison* (3d Cir. 1976) 535 F.2d 223, 226-228.)

The forms that such prosecutorial misconduct may take are many and varied. They include, for example, statements to defense witnesses to the effect that they would be prosecuted for any crimes they reveal or commit in the course of their testimony. (*People* v. *Warren, supra,* 161 Cal.App.3d at pp. 973-974 [warning concerning crime expected to be revealed]; *People* v. *Bryant, supra,* 157 Cal.App.3d at pp. 589-593 [warning concerning expected perjury]; *People* v. *Robinson* (1983) 144 Cal.App.3d 962, 967-970 [193

---

[5] Governmental interference with a defendant's right to present witnesses to establish a defense has been found in various situations. In *United States* v. *Blackwell* (D.C. Cir. 1982) 694 F.2d 1325, 1333-1334, the District of Columbia Circuit presented the following selective survey: "*Webb* v. *Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (per curiam) (defense witness effectively driven off witness stand by remarks of trial judge regarding penalties for perjury); *United States* v. *Smith,* 478 F.2d 976 (D.C.Cir.1973) (defense witness told by prosecutor that if he testified as indicated by other testimony he could or would be prosecuted for carrying a concealed weapon, obstructing justice, and as an accessory to murder); *United States* v. *MacCloskey,* 682 F.2d 468 (4th Cir.1982) (U.S. Attorney telephoned defendant's girlfriend's attorney to advise him to remind his client that if she testified at trial she could be reindicted on dropped charges); *United States* v. *Goodwin,* 625 F.2d 693 (5th Cir.1980) (defense witnesses intimidated by threats of prison officials conditioned upon whether the witnesses testified at trial); *United States* v. *Hammond,* 598 F.2d 1008 (5th Cir.1979) (defense witness threatened by FBI agent with retaliation in other cases pending against him); *United States* v. *Henricksen,* 564 F.2d 197 (5th Cir.1977) (per curiam) (defense witness intimidated by terms of his plea bargain in another case); *United States* v. *Thomas,* 488 F.2d 334 (6th Cir.1973) (per curiam) (defense witness told by secret service agent during recess of trial that he would be prosecuted for a felony if he testified); *Berg* v. *Morris,* 483 F.Supp. 179 (E.D.Cal.1980) (trial court coerced witness into giving inculpatory evidence by twice warning him that his probation would be revoked and perjury charges filed if the truth were not told)."

Cal.Rptr. 92] [warning concerning crime expected to be revealed]; *United States* v. *Blackwell, supra,* 694 F.2d at pp. 1336-1337 [warning concerning crime expected to be revealed]; *United States* v. *MacCloskey, supra,* 682 F.2d at pp. 476, fn. 16, 479 [same]; *United States* v. *Morrison, supra,* 535 F.2d at pp. 226-228 [warning concerning both crime expected to be revealed and expected perjury]; *United States* v. *Thomas, supra,* 488 F.2d at pp. 335-336 [warning concerning crime expected to be revealed]; *United States* v. *Smith, supra,* 478 F.2d at pp. 977-979 [warning concerning crime expected to be revealed].) They also include statements to defense witnesses warning they would suffer untoward consequences in other cases if they were to testify on behalf of the defense. (*United States* v. *Hammond, supra,* 598 F.2d at pp. 1012-1013; *United States* v. *Henrickson, supra,* 564 F.2d at pp. 197-198.) Finally, they include arresting a defense witness before he or other defense witnesses have given their testimony. (*Bray* v. *Peyton* (4th Cir. 1970) 429 F.2d 500, 501.)

■ In order to establish a violation of his constitutional compulsory-process right, a defendant must demonstrate misconduct. To do so, he is not required to show that the governmental agent involved acted in bad faith or with improper motives. (*United States* v. *Morrison, supra,* 535 F.2d at p. 227; see *People* v. *Bryant, supra,* 157 Cal.App.3d at p. 590; *People* v. *Robinson, supra,* 144 Cal.App.3d at p. 970; *United States* v. *Smith (D.C. Cir. 1973) 478 F.2d 976, 979; Bray* v. *Peyton, supra,* 429 F.2d at p. 501.) Rather, he need show only that the agent engaged in activity that was wholly unnecessary to the proper performance of his duties and of such a character as "to transform [a defense witness] from a willing witness to one who would refuse to testify . . . ." (*United States* v. *Smith, supra,* at p. 979; accord, *People* v. *Bryant, supra,* at p. 590; *People* v. *Robinson, supra,* at p. 970.)

To establish a violation, the defendant must also demonstrate interference, i.e., a causal link between the misconduct and his inability to present witnesses on his own behalf. To do so, he is not required to prove that the conduct under challenge was the "direct or exclusive" cause. (*Berg* v. *Morris, supra,* 483 F.Supp. at p. 184; accord, *People* v. *Warren, supra,* 161 Cal.App.3d at p. 974; *People* v. *Bryant, supra,* 157 Cal.App.3d at p. 590.) Rather, he need only show that the conduct was a substantial cause. (See *People* v. *Warren, supra,* at p. 974; *People* v. *Bryant, supra,* at p. 590; *Berg* v. *Morris, supra,* at p. 184.) The misconduct in question may be deemed a substantial cause when, for example, it carries significant coercive force (see *Bray* v. *Peyton, supra,* 429 F.2d at p. 501 [arrest]) and is soon followed by the witness's refusal to testify (*People* v. *Warren, supra,* 161 Cal.App.3d at p. 974).

Finally, the defendant must also demonstrate "materiality." To carry his burden under federal law, "he must at least make some plausible showing of how [the] testimony [of the witness] would have been both material and favorable to his defense." (*United States* v. *Valenzuela Bernal* (1982) 458 U.S. 858, 867 [73 L.Ed.2d 1193, 1202, 102 S.Ct. 3440] [potential witnesses made unavailable by prosecution].) Under California law he must show at least a reasonable possibility that the witness could have given testimony that would have been both material and favorable. (*Cordova* v. *Superior Court* (1983) 148 Cal.App.3d 177, 181-185 [195 Cal.Rptr. 758], citing cases [potential witnesses made unavailable by prosecution]; cf. *Honore* v. *Superior Court* (1969) 70 Cal.2d 162, 170 [74 Cal.Rptr. 233, 449 P.2d 169] [discussing the burden on a defendant seeking the disclosure of the identity of an anonymous informant].)

## 2. *Application of the Law to the Facts*

We turn now to the facts of this case. Relying directly on the referee's determinations and ultimately on the evidence presented at the habeas corpus hearing, petitioner argues that the prosecution interfered with his constitutional right to present witnesses at trial. In response the Attorney General asserts that the referee's findings and conclusions are unsupported.

■ Our standard of review in these circumstances is settled. "A referee's legal conclusions are subject to independent review. [Citation.] As to findings of fact, they 'are, of course, not binding on this court, and we may reach a different conclusion on an independent examination of the evidence produced at the hearing he conducts even where the evidence is conflicting. [Citation.] However, where the findings are supported by "ample, credible evidence" [citation] or "substantial evidence" [citation] they are entitled to great weight [citations] because of the referee's "opportunity to observe the demeanor of the witnesses and weigh their statements in connection with their manner on the stand . . . ." [Citation.]' " (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 219 [233 Cal.Rptr. 404, 729 P.2d 839].) This is particularly true of findings that go directly to the credibility of a witness or that depend in substantial part on an assessment of the witness's credibility. (See *In re Hall* (1981) 30 Cal.3d 408, 418 [179 Cal.Rptr. 223, 637 P.2d 690]; *In re Weber* (1974) 11 Cal.3d 703, 724 [114 Cal.Rptr. 429, 523 P.2d 229]; *In re Rosoto* (1974) 10 Cal.3d 939, 946 [112 Cal.Rptr. 641, 519 P.2d 1065, 69 A.L.R.3d 980].) Finally, "a referee's resolution of mixed law-fact questions is generally subject to independent review as predominantly questions of law—especially so when constitutional rights are implicated." (*People* v. *Ledesma, supra,* at p. 219.)

At the threshold, petitioner takes the position that the referee's determinations in their entirety are fully supported by the evidence and the

law. ■ The Attorney General, by contrast, raises a general objection which he asserts shows that the report should be rejected out of hand. Specifically, he claims that the referee's determinations are undermined by the failure of the report to explain the apparent lack of contemporaneous evidence of prosecutorial misconduct. In support of his point, he argues in substance as follows: if the prosecutorial misconduct alleged by petitioner had in fact occurred, some contemporaneous evidence thereof would exist; no such evidence exists; therefore, the misconduct alleged did not occur. We are not persuaded.

To begin with, the Attorney General's major premise appears untenable. Although we suspect that the existence of prosecutorial interference with a defendant's constitutional right to present the testimony of witnesses may often be reflected in contemporaneous evidence, we are hesitant to accept the categorical assertion that the existence of such misconduct will always be so manifested, especially since we are presented with no compelling reason to do so.

In any event, the Attorney General's minor premise is plainly erroneous: there *is* contemporaneous evidence of prosecutorial interference. It is true that the record contains no direct evidence. The absence of such evidence, however, is not crucial: it is likely that on at least some occasions a prosecutor who engages in such misconduct does so—either by chance or by design—off the record. It is also true that the record contains no complaints about the prosecution's conduct from the witnesses who were the targets of the alleged intimidation or from their counsel. Although in another case the lack of such complaints might be disturbing, in this case it is not: each of the allegedly intimidated witnesses was within the reach of the prosecution—because he was exposed to potential criminal liability or was presently incarcerated or both—and for that reason may understandably have declined to make any complaint.

But even though the record contains no direct contemporaneous evidence of prosecutorial interference, it does contain circumstantial evidence—i.e., evidence from which the existence of such misconduct can be inferred. For example, the record reveals that prosecution investigator Wilson arrested Stephen Aguilar outside the courtroom in the presence of persons he knew to be defense witnesses immediately after Aguilar gave testimony that contradicted that of the prosecution's key witness, Andrew Powell—to the effect that it was he, and not petitioner, who provided Powell with the murder weapon.

It is the Attorney General's position that in light of the peculiar facts of this case Wilson's action was not improper. Assuming for argument's sake

that he is correct, we cannot conclude that the arrest does not constitute evidence tending to show that the prosecution interfered with petitioner's right to present the testimony of witnesses at trial. The prosecution effectively admitted as much: at the reference hearing, Michael Rolan, a supervising prosecution investigator, stated that the day after Aguilar was arrested and the news was reported in the press, there was discussion in the district attorney's office to the effect that Wilson may have made a "mistake" and thereby laid a foundation for a mistrial. Even though the evidence of Aguilar's arrest, by itself, does not *establish* that the prosecution interfered with petitioner's constitutional right to present the testimony of witnesses at trial, it does support the inference that it did so.

The record also reveals that John Gross invoked his Fifth Amendment rights and refused to give substantive testimony on behalf of the defense, in spite of the fact that the testimony he proposed to give—to the effect that in his presence Powell admitted petitioner had nothing to do with the Crake murder—apparently could not have incriminated him. This evidence too supports the inference that the prosecution interfered with petitioner's right to present the testimony of witnesses at trial.

### a. *The Arrest of Stephen Aguilar*

■ Petitioner claims that the referee's determinations relating to the arrest of Stephen Aguilar are supported by the law and the evidence, and relies on the portion of the report summarized below.

Aguilar's testimony at trial flatly contradicted Powell's. During Aguilar's testimony, prosecutor Pippin and investigator Wilson discussed its incriminating nature. According to Wilson, a joint decision was made to arrest Aguilar. Pippin, however, denied he told Wilson to make the arrest. Wilson decided to arrest Aguilar in the hallway of the courthouse just outside the courtroom. He did not see Aguilar exhibit any signs of flight. He did see at least two defense witnesses and a news reporter in the hallway. He did not think about the impact such an arrest might have on defense witnesses.

Aguilar testified he thought he saw camera lights, but was not sure. Friends told him they had seen him on television. One of the defense witnesses present in the hallway, Marcia Sharpe, stated the arrest took place in front of her and defense witnesses Michelle Goff and Cynthia Rosenthal. As a result of the arrest, Goff and Rosenthal "turned white" and began shaking. Local newspapers carried news of Aguilar's arrest in the morning and afternoon editions. At least one television station carried news of the arrest during its noon coverage on the following day.

The portion of the report summarized above concludes: "The arrest of Mr. Aguilar, the defense's first witness at petitioner's criminal trial, was well-publicized and well-known to the three witnesses subpoenaed by the defense who later declined to testify. It is an important factor which must be considered in assessing the issue of prosecution intimidation."

The Attorney General raises several objections to the referee's determinations. He first argues in substance that the arrest of Aguilar was proper as a constitutionally reasonable seizure of the person and as such was proper insofar as petitioner's compulsory-process rights were concerned. Even if we assume for argument's sake that the arrest was lawful, we cannot accept the Attorney General's conclusion. The Fourth Amendment's guarantee given to all persons against unreasonable searches and seizures and the Sixth Amendment's recognition of the criminal defendant's right to present evidence on his own behalf are each designed to serve different purposes and protect different values. Hence, contrary to the Attorney General's assumption, it does not follow that conduct on the part of the government that does not violate the former constitutional provision necessarily does not violate the latter.

It is clear to us that the prosecution committed misconduct under the Sixth Amendment in arresting Aguilar when and where it did: Wilson engaged in activity that was completely unnecessary under the circumstances—he was under no legal or practical compulsion to make the arrest in the presence of defense witnesses and the press—and was of such a character as "to transform [a defense witness] from a willing witness to one who would refuse to testify" (*United States* v. *Smith, supra,* 478 F.2d at p. 979).

Our conclusion is strengthened by the Attorney General's concession that "there might have been a more ideal setting for the arrest," and all the more so by the fact and content of the discussion, related by supervising prosecution investigator Rolan, which took place in the district attorney's office the day after the arrest. In *Bray* v. *Peyton, supra,* 429 F.2d 500, the Fourth Circuit held that the prosecution committed misconduct by arresting a defense witness during trial, finding it "difficult to imagine" that the incident would not have had an intimidating effect not only on the person arrested but on other defense witnesses as well. (*Id.* at p. 501.) In this case, we come to the same conclusion for the same reason.

The Attorney General attempts to make much of the fact that the referee did not specifically find that Wilson intended to intimidate witnesses in arresting Aguilar. But as we have explained, the existence of bad faith or improper motives on the part of the governmental agent is not required.

(*United States* v. *Morrison, supra,* 535 F.2d at p. 227; see *People* v. *Bryant, supra,* 157 Cal.App.3d at p. 590; *People* v. *Robinson, supra,* 144 Cal.App.3d at p. 970; *United States* v. *Smith, supra,* 478 F.2d at p. 979; *Bray* v. *Peyton, supra,* 429 F.2d at p. 501.)

The Attorney General also argues in effect that the defense was partially responsible for the arrest because it allegedly violated an agreement to bring to the court's attention potentially privileged testimony before such testimony was given, and hence that it may not now be heard to complain. The argument must be rejected. The referee impliedly found—with what appears to be adequate support in the record—that no such broad agreement existed, and that even if it did the defense committed no violation of its terms. In any event, the alleged violation plainly did not contribute in any way to the improvident *manner* of the arrest and therefore does not bar petitioner from making his complaint.[6]

After independent review, we agree with the referee's determination that the time, place, and manner of Stephen Aguilar's arrest were improper, and accordingly adopt it as our own.

### b. *The Intimidation of Charles Riley*

■ Petitioner claims that the referee's determinations relating to prosecutorial interference with his constitutional right to present the testimony of Charles Riley at trial are supported by the law and the evidence. He relies on the portion of the report summarized below.

Following Aguilar's arrest, petitioner's trial counsel informed the court that Riley had been subpoenaed and was prepared to take the stand and completely corroborate Aguilar's testimony. The court decided that Riley should speak to a lawyer before testifying, and had Matthew Lees appointed to represent him. Lees testified that prosecutor Pippin told him if Riley testified he would file charges against him. Lees believed Pippin did not want Riley to testify and would arrest Riley if he did. He did not, however,

---

[6] In an excursus, the Attorney General argues that Aguilar "embellished" the story of his arrest by intentionally overstating both its coverage by the press and its consequences, viz., his alleged dismissal from his position as a used-car salesman. He further argues that Aguilar created the "embellishment" to help petitioner's case and—in view of the poor character he allegedly displayed in providing Powell with a gun—must have done so because he was "bought."

After reviewing the entire record, we have some doubt that Aguilar substantially "embellished" the story of his arrest. Further, we are not persuaded that Aguilar "sold" his testimony to petitioner. The Attorney General, to be sure, strenuously asserts that he did so. But his assertion does not make up for the lack of solid evidence to support his point—indeed, it makes the lack all the more evident.

tell the court of Pippin's comments. Pippin asserted he merely told Lees that he was blanketly refusing to grant immunity of any kind to any witness in this trial, and that if Riley testified and implicated himself in any crime and could be prosecuted he would be prosecuted. He said he would have given this same "admonition" to any attorney for any defense witness in this case. Riley told Lees that he did not know what the gun was going to be used for when he lent it to Aguilar; he expressed at least half a dozen times his fears about the threat of prosecution and arrest if he testified.

At the reference hearing, the report continues, Riley testified that shortly after entering the courtroom he was asked to accompany prosecution investigator Wilson down the hallway for an interview. Riley stated he felt pressured because Wilson was "in his face" and appeared angry and upset. Wilson told him that if he testified as Aguilar had, the same thing that happened to Aguilar would happen to him. Riley informed Wilson he had lent the handgun to Aguilar. His conversation with Wilson caused him to be apprehensive about testifying. He was told by Lees that the prosecution did not want him to testify and would pursue him if he did. He was also told that the choice whether to testify was his. He factored into his decision Wilson's threatening remarks and Pippin's remarks to his counsel. Because he did not want to be arrested, he chose not to testify.

Wilson's story was different. He stated that Riley said he lent the gun to Aguilar and threw it away after receiving it back. Wilson informed him that he should have an attorney because he could be charged as an accessory to murder.

The portion of the report summarized above concludes as follows. "The testimony of prosecutor Pippin and investigator Wilson, even when examined in isolation, establish[es] witness intimidation. It is clearly coercive for a prosecutor to warn a witness he will be prosecuted, or is likely to be prosecuted, as a result of his testimony. Warning only defense witnesses they will be prosecuted for *any* crimes they reveal if they take the stand is clearly the type of admonition which destroys the willingness of an individual to risk testifying on behalf of a defendant.

"According to Mr. Pippin, he told Lees if Riley testified and implicated himself in *any* crime he would be prosecuted if at all possible. Mr. Pippin gave this admonition to several representatives of defense witnesses, but did not make a similar admonition to any prosecution witness. . . .

"Additionally, investigator Wilson's admission he told Riley he could be charged as an accessory to murder, coming the day after Mr. Aguilar's arrest, was blatantly intimidating. No reasonable person would testify for

another after hearing a prosecution representative predict the testimony would earn the witness a murder charge.

"When the testimony of Mr. Lees and Riley are also factored, the case for witness intimidation becomes overwhelming. According to attorney Lees, he was told by Pippin Riley would be arrested if he testified; Riley testified he was told the same by Wilson. Both witnesses were credible; they corroborated one another and were not effectively impeached.

"Petitioner has met his burden of proof. Charles Riley was intimidated. Petitioner thus lost Riley's important testimony which would have corroborated Mr. Aguilar. His testimony would have shown Powell lied when he said Martin was the source of the gun used to beat the victim to death. It would also have corroborated Eugene Wallace's potential testimony which described the falsity of Powell's testimony against petitioner."

The Attorney General raises several objections to the referee's determinations. He first claims that the determination that Wilson engaged in misconduct toward Riley must be rejected. Specifically, he argues that there is insufficient evidence to believe Riley's version of the encounter—which he impliedly concedes establishes misconduct—and to disbelieve Wilson's. The argument is unpersuasive.

To begin with, the Attorney General urges that Riley is not a credible witness. In support he offers several points. First, he correctly notes that at the reference hearing Riley claimed he never received the murder weapon back from Aguilar, but earlier had admitted he had done so. It does not follow, however, that Riley's inconsistency on this single issue is fatal to his credibility, especially in light of the consistency with which he admitted that he had provided Aguilar with the gun and then directed him to see to its disposal.

The Attorney General next asserts that at the reference hearing Riley admitted Wilson did not touch him during the encounter, but earlier had stated Wilson "pushed me up against a wall" and used "physically abusive tactics." But Riley presented an explanation of the apparent inconsistency that the referee could credit—to the effect that Wilson took a position about 12 inches from his face and "crowded" him into the wall. Riley's explanation was corroborated by defense investigator Dale June, who testified that during the encounter Wilson stood closer to Riley than one usually stands in polite conversation and kept punctuating his speech with his right index finger, which he moved back and forth about four or five inches from Riley's face.

The Attorney General then maintains that Riley testified he saw Aguilar's arrest on television, and that this statement was false because he asserts the arrest was not broadcast. Read in its context, however, Riley's testimony is only to the effect that he *heard of* Aguilar's arrest on the television news. Indeed, he specifically denied that he saw the arrest itself.

Finally, the Attorney General states that Riley is not to be believed because he is of poor character. It is true that a person who would lend a weapon as Riley did is evidently not unworthy of blame. But it is precisely a person of this kind who would in fact have done such a deed. In any event, such a person's testimony cannot be rejected out of hand—as the Attorney General himself admits when it comes to the testimony of Andrew Powell.

The Attorney General next urges that Wilson is as credible a witness as Riley is not. Specifically, he argues as follows: "Wilson would have to be very stupid to threaten Riley with arrest and then assist in getting Riley a lawyer who would be informed of these threats and act accordingly. The report never characterizes Wilson as 'stupid.' "

Assuming for purposes of discussion that Wilson is not "very stupid," it does not follow, as the Attorney General implies, that Wilson's action is otherwise inexplicable. Quite the contrary: Wilson could have acted as he did with the intent of depriving petitioner of Riley's evidence by threatening Riley with prosecution on the basis of his expected testimony and then advising him to seek the assistance of counsel—who would undoubtedly inform him of his rights under the Fifth Amendment. Riley, of course, refused to give substantive testimony on petitioner's behalf, resting on his privilege against self-incrimination.

The Attorney General also argues that the absence from the trial record of any contemporaneous complaint about Wilson's behavior establishes that no misconduct occurred. Like a similar argument presented above, this too must be rejected.

The Attorney General also claims in substance that the determination that Wilson's statement that Riley could be charged as an accessory to murder amounted to misconduct must be rejected on the ground that it was a constitutionally permissible "mere warning." (*United States* v. *Risken* (8th Cir. 1986) 788 F.2d 1361, 1371; see, e.g., *United States* v. *Blackwell, supra,* 694 F.2d at pp. 1335-1336.) The point lacks merit. Seen by itself and in the abstract, the statement may appear to be such a "mere warning." Seen in light of the facts of this case, however, the statement appears to be simply an aspect of Wilson's threat that if Riley testified he would suffer the same fate as Aguilar.

In conclusion, we hold that the referee's determination that Wilson engaged in misconduct toward Riley must be accepted. The referee's finding that Wilson threatened Riley with the same fate as Aguilar is entitled to great weight, depending in substantial part as it does on the assessment of the credibility of witnesses, and is in fact amply supported by the evidence. Moreover, the conclusion that such behavior amounts to misconduct is compelled. (E.g., *United States* v. *Thomas, supra,* 488 F.2d at pp. 335-336 [holding that a United States Secret Service Agent committed misconduct when he told a potential defense witness he would be prosecuted for the crime his testimony was expected to reveal]; cf. *United States* v. *Hammond, supra,* 598 F.2d at pp. 1012-1013 [holding that an agent of the Federal Bureau of Investigation committed misconduct when he told a defense witness he "would have 'nothing but trouble' " in another matter pending against him if he continued to give testimony on the defendant's behalf].)

The Attorney General next claims that the determination that prosecutor Pippin engaged in misconduct toward Riley must be rejected. Specifically, he denies that Pippin told Matthew Lees, Riley's counsel, that Riley would be arrested and prosecuted if he testified. He asserts that the following occurred: in response to a request for immunity made by Lees, Pippin said "immunity was not going to be given to anyone; if the witness testified and implicated himself in a crime that could be proved at trial, he would be prosecuted; if the witness got on the stand and committed perjury, the witness would be prosecuted for perjury." The Attorney General further asserts that this statement does not amount to misconduct. As we shall explain, the point is without merit.

We are hesitant to reject the referee's finding crediting Lees's version of his encounter with Pippin. The finding, of course, depends in substantial part on the referee's assessment of the credibility of witnesses and hence is entitled to great weight. Moreover, contrary to the Attorney General's argument, the evidence appears to provide the necessary support.

Be that as it may, the statement that the Attorney General claims Pippin made—to the effect that Riley *would be* prosecuted for *any* crime he revealed or committed in the course of his testimony—amounts to misconduct under the circumstances of this case. (*People* v. *Warren, supra,* 161 Cal.App.3d at pp. 973-974; *People* v. *Bryant, supra,* 157 Cal.App.3d at pp. 589-593; *People* v. *Robinson, supra,* 144 Cal.App.3d at pp. 967-970; *United States* v. *Blackwell, supra,* 694 F.2d at pp. 1336-1337; *United States* v. *MacCloskey, supra,* 682 F.2d at p. 476, fn. 16, 479; *United States* v. *Morrison, supra,* 535 F.2d at pp. 226-228; *United States* v. *Thomas, supra,* 488 F.2d at pp. 335-336; *United States* v. *Smith, supra,* 478 F.2d at pp. 978-979.) That the statement that the Attorney General claims Pippin made

amounts to something less than an absolutely unqualified commitment to prosecute does not remove it from the category of misconduct. (See *People* v. *Warren, supra,* at pp. 968-970 973-974.)[7]

The Attorney General unpersuasively argues that the cases supporting the conclusion that Pippin's statement amounts to misconduct are distinguishable on the ground they all involve statements made directly to the witness and not to his attorney alone. First, it is not true that all the cases involve statements made directly to the witness. (See *United States* v. *MacCloskey, supra,* 682 F.2d at pp. 476, 479.) Second, it is generally immaterial how such a statement is communicated to the witness: its potentially intimidating effect depends ultimately on its content and its original source, not on the identity of the person who delivers it to the witness. Certainly, the point may not legitimately be disputed when, as here, the prosecutor admits he expected and indeed hoped the witness's attorney would communicate the statement to the witness.[8]

In conclusion, we hold that the referee's determination that Pippin engaged in misconduct toward Riley must be accepted: the governing law is clear, and the facts that establish misconduct under the law are admitted.

Finally, the Attorney General claims that the determination that prosecutorial misconduct was causally linked to Riley's refusal to give testimony on petitioner's behalf must be rejected. He first argues that the arrest of Aguilar could not have contributed to the refusal on the part of any witness, including Riley, to give testimony on petitioner's behalf at trial. Specifically, he relies on the absence of evidence in the trial record showing the requisite causal link. Although the absence of such evidence is not insignificant, it certainly does not establish that no causal link existed. This is especially so

---

[7] In support of his position, the Attorney General refers to the opinion expressed by the trial judge during his testimony at the reference hearing, to the effect that the statement Pippin allegedly made is proper. As the foregoing discussion of the applicable law demonstrates, however, we cannot accept the judge's opinion on this point.

[8] The Attorney General also argues that *Holbert* v. *U. S.* (D.C. App. 1986) 513 A.2d 825, supports his position that Pippin did not engage in misconduct. He is wrong. On even a superficial reading *Holbert* is distinguishable. Unlike the prosecutor in that case, Pippin clearly did not bring the matter of Riley's potentially self-incriminating testimony to the trial court's attention or seek its guidance on how to proceed. Quite the opposite: he took the matter into his own hands and kept it there. Also unlike the prosecutor in that case, Pippin did not discharge his "ethical obligation" through the trial court's appointment of independent counsel to advise Riley of his Fifth Amendment privilege against self-incrimination. Rather, he made the statement to Riley's counsel—with the expectation and hope he would pass it on—to the effect that Riley would be prosecuted for any crime that he revealed or committed in the course of his testimony. It may be, as the Attorney General appears to suggest, that it is constitutionally permissible for a prosecutor to give a witness a "mere warning" about the dangers of perjury. In this case, however, Pippin himself admits he gave more than such a "mere warning."

because the absence of such evidence may have been caused at least in part by Riley's decision to refrain from complaining about the prosecution's action—and thereby to attempt to avoid becoming its target. The Attorney General also relies on the fact that at the reference hearing the trial judge "expressly stated he did not believe any of the witnesses who asserted their privilege against self-incrimination did so as a result of Aguilar's arrest." The judge, however, made no such statement. In response to the question, "When the other defense witnesses came in the courtroom and took the Fifth Amendment, did it cross your mind . . . that perhaps these witnesses were taking the Fifth because of what had happened to the first defense witness as that witness left the trial action?" the judge merely said, "Well, at least—no, it didn't."

Next, the Attorney General makes a perfunctory argument to the effect that Riley's refusal to testify on petitioner's behalf was not causally linked to his encounter with Wilson or to the statement made by Pippin. Contrary to this argument, we find the conclusion that the requisite causation existed to be inescapable. Such a causal link is established when the misconduct under challenge is a substantial cause of the witness's refusal to testify. (See *People* v. *Bryant, supra,* 157 Cal.App.3d at p. 590; *Berg* v. *Morris, supra,* 483 F.Supp. at p. 184.) At the hearing, Riley stated his decision not to testify resulted from the encounter with Wilson and the statement of Pippin. Thus to our mind, the misconduct here amounts to such cause.

We also conclude that petitioner has sustained his burden of demonstrating the "materiality" of Riley's testimony under both federal and state standards. Specifically, he has plainly shown "how [the] testimony [of Riley] would have been both material and favorable to his defense" (*United States* v. *Valenzuela-Bernal, supra,* 458 U.S. at p. 867)—i.e., it would have squarely contradicted the testimony of Andrew Powell, the crucial prosecution witness. He has also shown—a fortiori—at least a reasonable possibility that Riley could have given testimony that would have been both material and favorable. (*Cordova* v. *Superior Court, supra,* 148 Cal.App.3d at pp. 181-185, citing cases.)

After independent review, we hold that the referee's determination that the prosecution interfered with petitioner's constitutional right to present the testimony of Charles Riley at trial was correct and accordingly adopt it as our own.

c. | *The Intimidation of Eugene Wallace*

██ Petitioner claims that the referee's determinations relating to prosecutorial interference with his constitutional right to present the testimony

of Eugene Wallace at trial are supported by the law and the evidence. He relies on the portion of the report summarized below.

Eugene Wallace was Powell's cellmate throughout Powell's confinement in the San Diego County jail during the summer of 1981, and was facing robbery charges. He would have testified at petitioner's trial that he helped Powell fabricate a story to implicate petitioner in the Crake murder. He was prepared to tell the prosecution about Powell's efforts to frame petitioner as early as mid-June 1981. He had asked his then defense attorney, Charles Adair, to inform the prosecution of information he had pertaining to another case. Adair confirmed he had such a discussion with Wallace.

Following petitioner's arrest, the report goes on, Wallace read about Powell's story in the newspapers. Through another inmate, Michelle Bernard, Wallace made contact with petitioner's attorney, Leslie Osborne, and told him he had valuable exculpatory information. Osborne learned Wallace and Bernard wanted bail and an enormous sum of money in return for the information they had about Powell and an alleged document that was a "script" worked out by Powell and other inmates to frame petitioner. Osborne feigned agreement to the terms and immediately contacted the prosecution. The prosecution arranged a fake release—or "phony roll out"—of Wallace and Bernard in the hope the inmates would bring whatever documents they had with them when they were about to be freed.

On September 22, 1981, the "phony roll out" took place. Found in the belongings of Wallace was a paper bearing Powell's handwriting which gave directions to petitioner's office and details about his family and other personal matters. Later that same day, Wallace was interviewed by investigator Wilson. Wilson and Wallace differ on their recall of the conversation. Wallace testified he told Wilson that petitioner was not guilty and that the district attorney's office was prosecuting the wrong man. He said he had helped Powell fabricate his story to frame petitioner. Wilson told him he did not know anything about the case and it sounded like he was involved in an extortion attempt which could bring on habitual criminal charges. Wilson admitted having "small talk" with Wallace about extortion and being handled as a career criminal. He also admitted "probably" talking to Wallace about sentence enhancements. Further, he admitted that Wallace claimed Powell fabricated the story.

By September 1981, the report continued, Barton Sheela represented Wallace on his pending robbery charges. His representation began in mid-1981 and extended through the spring of 1982. During his negotiations with the district attorney's office, he was never told of the alleged extortion or

related possible charges alluded to by Wilson in his September 22, 1981, interview with Wallace.

When Wallace was subpoenaed to testify in petitioner's trial in March of 1982, however, prosecutor Pippin informed Sheela "in no uncertain terms"—according to Sheela—that if Wallace testified, he would be prosecuted for any crimes his testimony disclosed. Pippin also made clear he would cross-examine Wallace on the "extortion." According to Sheela, Wallace was well aware of Aguilar's arrest. He advised Wallace, "There was probably close to 100 percent probability that he'd be prosecuted" if he testified on petitioner's behalf. Sheela was of the impression the prosecution's intent was to persuade Wallace not to testify. Wallace expressed to Sheela his concern about Wilson's threatening statements in the September 22, 1981, interview.

Pippin, the report continues, testified he gave Sheela the same admonition he had previously given Riley's attorney, Matthew Lees—he was blanketly refusing to grant immunity of any kind to any witness in this trial, and if Wallace testified and implicated himself in a crime he would be prosecuted if he could be. Pippin was aware of the September 22, 1981, interview. By the time of petitioner's trial, he believed Wallace could have been charged with attempted extortion. To Pippin's knowledge, however, Wallace had not been informed, prior to petitioner's trial, that he would actually face such a charge. It appears a real threat to prosecute Wallace for the alleged plot to commit extortion arose when he was about to testify for petitioner. Wallace explained his refusal to testify at petitioner's trial: he felt threatened by Wilson's September 22, 1981, statements; he believed on the basis of Pippin's statements that if he testified he could be prosecuted; he felt sure that the prosecution would make good on its threat because of Aguilar's arrest.

The portion of the report summarized above concludes as follows. "Petitioner has sustained his burden of proof in demonstrating witness Eugene Wallace was intimidated and refused to testify based upon such intimidation. Here, the prosecution was well aware of Wallace's alleged effort to extort money beginning from September 22, 1981. At no time during the months which followed did the prosecution mention bringing such charges against Wallace. The issue of extortion arose only when Wallace appeared as a witness for Martin.

"As with Mr. Riley, Mr. Pippin's statements alone are sufficient to find witness intimidation. Telling only defense witnesses they will be prosecuted if they testify and implicate themselves in *any* crime is far too threatening and over broad a statement, and completely unnecessary as a response to a

question on whether he will grant the witness immunity. A simple no would have sufficed.

"Additionally, Mr. Wilson's admitted statements to Wallace concerning possible extortion charges, a career criminal act prosecution, and sentence enhancements, were hardly calculated to encourage later cooperation of Wallace with petitioner's defense. Coupled with the arrest of Aguilar and Mr. Pippin's announced position to Sheela, Wallace reasonably would believe his testimony for Martin would bring on a plague of criminal charges.

"Further, the testimony of attorney Bart Sheela corroborates Martin's claim Wallace was intimidated. Sheela, a former Assistant United States Attorney and county prosecutor, testified Mr. Pippin did not merely state a position of his office, but went out of his way to say Wallace would be prosecuted *if he testified*.

"Eugene Wallace should have been permitted to make his decision to testify without the intimidating influence of such heavy-handed prosecution statements."

The Attorney General raises several objections to the referee's determinations. He claims at the threshold that because there was apparently no contemporary complaint about prosecutorial misconduct the determination that misconduct occurred must be rejected. As we have explained above, such a claim lacks merit, especially when as here the misconduct alleged constituted a successful attempt to silence a witness.

The Attorney General next claims that the determination that Wilson engaged in misconduct toward Wallace cannot be accepted. He impliedly concedes that if Wilson made the statements at issue he would have committed misconduct, but argues that the evidence is insufficient to support the finding that Wilson in fact made those statements. Specifically, he asserts in essence that the finding turns on the credibility of the witnesses and that Wallace is a bad man and a liar and hence cannot be believed. But even if the premise of the argument is sound, the conclusion does not follow: even a bad man and a liar can tell the truth—as the Attorney General himself argues when he urges us to credit the testimony of Powell.[9]

---

[9] The Attorney General argues that the referee's finding that Wallace told Wilson and Jeffrey Koch, who was also present at the interview, that he and Powell "concocted" a story to "frame" petitioner for Crake's murder is not supported by the evidence: "Close examination of the evidence shows what was concocted was a plan to get $1.5 million from petitioner, not with a story to frame petitioner, but with the threat Powell would tell the truth to the police about petitioner." In view of the fact, which was recognized by the referee, that at one time or another both Wilson and Koch admitted under oath that Wallace spoke of a story

In conclusion, we hold that the referee's determination that Wilson engaged in misconduct toward Wallace must be accepted. The referee's finding that Wilson threatened Wallace with, among other things, prosecution for extortion is entitled to great weight, depending as it does on an assessment of the credibility of witnesses, and is in fact amply supported by the evidence. It is plain, as we have explained above, that such behavior amounts to misconduct.

The Attorney General also claims that the determination that prosecutor Pippin engaged in misconduct toward Wallace cannot be accepted. Specifically, he maintains that the finding that Pippin told Sheela, Wallace's counsel, that Wallace "would be prosecuted *if he testified*" is based on a misinterpretation of Sheela's testimony. He further asserts that in response to a request for immunity made by Sheela Pippin simply made the same statement he made to Riley's counsel, Matthew Lees—viz., "if a witness testified and implicated himself in a crime that could be proved, he would be prosecuted; if the witness committed perjury and there was sufficient evidence to prove perjury, he would be prosecuted." The point lacks merit.

To begin with, the referee's finding does not appear to be based on a misinterpretation of Sheela's testimony. Sheela testified: "I recall Mr. Pippin using words that let me know in no uncertain terms that Mr. Wallace would be prosecuted, but not saying, 'Mr. Wallace will be prosecuted if he testifies.'" The Attorney General argues that Sheela's testimony reveals only his "subjective belief that Mr. Pippin would prosecute Wallace . . . ." Given a reasonable reading, however, Sheela's testimony is to the following effect: "Pippin told me Wallace would be prosecuted if he testified—but he did not use those precise words."[10]

In any event, the statement that the Attorney General claims Pippin made to Sheela—like the same statement he claims Pippin made to Lees—amounts to misconduct: for the same reasons we held that statement improper we must hold this statement improper as well.

Accordingly, we conclude that the referee's determination that Pippin engaged in misconduct toward Wallace must be accepted: the governing law is clear, and the facts that establish misconduct under that law are admitted.

---

"concocted" to "frame" petitioner, we have no difficulty in concluding that the referee's finding is amply supported by the evidence.

[10] The Attorney General argues that the nonthreatening character of Pippin's actual words is revealed by the fact that petitioner's trial counsel, John Mitchell, who he says was present when they were spoken, did not complain of misconduct. The argument fails because the premise is unsupported: the evidence shows that Mitchell was not in fact present when Pippin made the statement in question.

Finally, the Attorney General claims that the determination that prosecutorial misconduct was causally linked to Wallace's refusal to give testimony on petitioner's behalf must be rejected. He first argues that the arrest of Aguilar could not have contributed to the refusal on the part of any witness, including Wallace, to give testimony on petitioner's behalf at trial. For the reasons we rejected this argument when he made it with reference to Riley, we also reject it now.

The Attorney General next argues as follows: Wallace was prepared to testify for petitioner if he was granted immunity or if he was examined on only those matters on which he would not incriminate himself; when his conditions were not met, he invoked his Fifth Amendment privilege; the fact that his testimony would be incriminating was not the fault of the prosecution; moreover, his willingness to testify on petitioner's behalf after the September 22, 1981, interview belies the conclusion he was afraid to testify because Wilson threatened him. The argument misses the point.

That Wallace may have been willing to testify on petitioner's behalf if he was granted immunity or if he was examined on only those matters on which he would not incriminate himself does *not* show that his decision to invoke his constitutional privilege against self-incrimination was not substantially caused by the threats of the prosecution. Indeed, Wallace's willingness to testify only "on conditions" shows he took the prosecution's threats seriously and therefore is consistent with the conclusion that those threats were a substantial cause of his making his decision to invoke the Fifth Amendment and refuse to testify on petitioner's behalf.

We conclude that petitioner has sustained his burden of showing a causal link between prosecutorial misconduct and Wallace's refusal to testify on his behalf. To carry that burden, as we have explained above, all he need do is to demonstrate that the misconduct under challenge was a substantial cause of the witness's refusal to testify. Petitioner has demonstrated that the misconduct here amounted to such a cause.

We also conclude that petitioner has carried his burden of demonstrating the "materiality" of Wallace's testimony under both federal and state standards: that testimony would have squarely contradicted the crucial testimony of Powell.

After independent review, we hold that the referee's determination that prosecutorial misconduct interfered with petitioner's constitutional right to present the testimony of Eugene Wallace at trial was correct and accordingly adopt it as our own.

#### d. *The Intimidation of John Gross*

 Petitioner claims that the referee's determinations relating to prosecutorial interference with his constitutional right to present the testimony of John Gross at trial are supported by the law and the evidence. He relies on the portion of the report summarized below.

Gross was an inmate in the San Diego County jail in the summer of 1981 facing robbery charges. He met Powell and asked him why, if petitioner had paid him to go to the Crake residence, petitioner did not bail him out. Powell responded by disclaiming petitioner's involvement: he said that he went out to the Crake residence on his own and that petitioner had nothing to do with the matter. Gross testified that his appointed attorney, Fred Corbin, would have had him testify. He was afraid, however, to take the stand because his case was still pending sentencing; he was aware of the prosecution's apparent disdain for people who testified for petitioner; he was also aware of Aguilar's arrest and of the threats made to Wallace by prosecution investigator Wilson—he could see that Wallace was "a changed man" as a product of that act of intimidation. Prosecutor Pippin did not recall giving his "admonition" to Gross's counsel, but did state that if he had been asked for immunity, he must have said the same thing that he said to the other attorneys.

It does not appear that Gross's testimony would have incriminated him. His fears of prosecution retaliation motivated his refusal to testify more than any concern about incriminating himself.

The portion of the report summarized above concludes as follows. "By the time Gross was called to the stand, the pool of witness intimidation had spread. Aguilar had been publicly arrested. Riley had refused to testify. Gross had noticed the intimidation register on his friend Eugene Wallace stemming from his September 22, 1981, Wilson interview. Given the lack of any prospect for incriminating testimony, it is clear intimidation is what moved him to decline to testify.

"Petitioner has carried his burden. John Gross was intimidated by the actions of the prosecution in publicly arresting Ste[ph]en Aguilar, Mr. Wilson's threats to Eugene Wallace, and in Mr. Pippin's remarks to the various defense counsel as to his position should witnesses testify for Martin and say anything incriminating."

The Attorney General raises several objections to the referee's determinations relating to Gross. He first claims in substance that the prosecution committed no misconduct *toward Gross*. In support he relies on the evident-

ly undisputed fact that the prosecution did not threaten Gross, and that indeed it did not know of his existence until he took the stand. Contrary to the Attorney General's apparent assumption, there is no requirement that the prosecution must be found to have committed misconduct *toward the individual witness* before it can be held to have interfered with the defendant's constitutional right to present the testimony of that witness.

The Attorney General also claims that the determination that prosecutorial misconduct was a cause of Gross's refusal to give testimony on petitioner's behalf must be rejected. He first maintains that the arrest of Aguilar could not have contributed to the refusal on the part of any witness, including Gross, to testify at trial. For the reasons we rejected this argument when he made it with reference to Riley and Wallace, we also reject it now.

The Attorney General next argues there were no contemporaneous charges or other evidence that Gross refused to testify as a result of prosecutorial misconduct and hence that his refusal to testify could not have resulted from such misconduct. For the reasons we found unpersuasive similar arguments above we find this argument unpersuasive as well.

The Attorney General also asserts that Gross is a bad man and a liar and hence cannot be believed when he testifies that prosecutorial misconduct caused him to refuse to testify. The argument is empty because, as we have explained, the conclusion does not follow from the premise.

Finally, the Attorney General argues that evidence in the record establishes that Gross's testimony on the effect of prosecutorial misconduct on his invocation of his Fifth Amendment privilege is unbelievable and therefore must be rejected. Neither of the points on which he relies, however, provides sufficient support to his argument.

The first point is that Gross falsely testified he was facing *trial* at the time he was called as a witness by petitioner when in fact he was facing *sentencing*. We fail to see—and certainly have not been shown—how such a "falsehood" could cast substantial doubt on the truth of Gross's statement that he feared the effect his testimony might have on his own case. Moreover, we find it difficult to conclude that Gross gave false testimony in the first place. The Attorney General's point rests on the premise that it is clear that the word "trial" does not include sentencing. That premise, however, is unsupported. ▮ As a plurality of this court stated, "while the word 'trial' has long been interpreted to refer to the process culminating in the determination of guilt, particularly in bail cases [citation], the word has also been interpreted to include the sentence or judgment in other cases [citation].

Accordingly, we recognize that the word is ambiguous . . . ." (*People* v. *Overstreet* (1986) 42 Cal.3d 891, 896 [231 Cal.Rptr. 213, 726 P.2d 1288].)

The Attorney General's second point is as follows: "Gross' . . . claim—that he was afraid to testify because of the impact his testimony would have on his sentence—is unbelievable. The resolution of Gross' case . . . included a stipulated sentence . . . . Gross' testimony for petitioner could not have affected his case. Gross was represented by counsel at petitioner's trial and any possible concern about his case could be taken care of by counsel." We are unable, however, to conclude that Gross's fear is "unbelievable." After he learned that Aguilar had been arrested and saw the effects of the prosecution's threats on Wallace, Gross—who had just suffered his only felony conviction and therefore was no criminal sophisticate—could reasonably have believed, as he stated, that testifying for petitioner would provoke the prosecution and thereby cause it to attempt to adversely affect his sentence.

The Attorney General may be understood to claim that even if prosecutorial misconduct was an actual cause of Gross's refusal to testify, the prosecution cannot be deemed legally responsible for his decision. We cannot agree. We recognize that the prosecution evidently committed no misconduct aimed at Gross specifically. We believe, however, that where, as here, the prosecution has engaged in misconduct toward a substantial number of defense witnesses, it is highly probable other defense witnesses would learn of its actions, apply the implications to their own situations, and thus be deterred from testifying. Prosecution investigator Wilson unnecessarily arrested Aguilar in front of three defense witnesses and a representative of the press; and prosecutor Pippin publicly and repeatedly declared that he was blanketly refusing to grant immunity of any kind to any witness in this trial, and would prosecute any witness for any crime he revealed or committed in the course of his testimony. We also believe that the prosecution's misconduct was a substantial factor in Gross's decision not to testify; indeed, the facts do not reveal the presence of any other factor. Accordingly, we are of the opinion that the prosecution must be deemed legally responsible for that decision.

We conclude that petitioner has sustained his burden of showing a causal link between prosecutorial misconduct and Gross's refusal to testify on his behalf. To carry that burden, as we have explained above, all he need do is demonstrate that the misconduct under challenge was a substantial cause of the witness's refusal to testify. Petitioner has demonstrated that the misconduct here amounts to such a cause.

We also conclude that petitioner has carried his burden of demonstrating the "materiality" of Gross's testimony under both federal and state stan-

dards: that testimony would have squarely contradicted the crucial testimony of Powell.

After independent review, we hold that the referee's determination that prosecutorial misconduct interfered with petitioner's constitutional right to present the testimony of John Gross at trial was correct and accordingly adopt it as our own.

### e. *Conclusion*

The foregoing discussion makes plain that petitioner has carried his burden of showing that prosecutorial misconduct interfered with his constitutional right to present the testimony of witnesses at trial. First, he has established prosecutorial misconduct. Second, he has shown a causal link between that misconduct and the refusal of Riley, Wallace, and Gross to testify. Third, he has demonstrated "materiality" under both federal and state standards.

The Attorney General argues that even if petitioner was denied his federal constitutional right to compulsory process through the prosecution's intimidation of potential defense witnesses, he is not entitled to relief if the People can show, under the standard of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065], that the violation was harmless beyond a reasonable doubt. He further argues that the People can make that showing. In response, petitioner maintains that a violation of a criminal defendant's federal constitutional right to compulsory process is prejudicial per se.

We need not, however, resolve the issue whether the violation is prejudicial per se. Prejudice appears here not only under the federal *Chapman* standard but also under the state law standard of *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].

First, the case was evidently very close. The fact that the jury deliberated almost 22 hours over 5 days practically compels the conclusion. (*People* v. *Cardenas* (1982) 31 Cal.3d 897, 907 [184 Cal.Rptr. 165, 647 P.2d 569] [stating that the fact the jury deliberated for twelve hours was "a graphic demonstration of the closeness of this case"]; *People* v. *Rucker* (1980) 26 Cal.3d 368, 391 [162 Cal.Rptr. 13, 605 P.2d 843] [implying that the fact the jury deliberated for nine hours evidenced the closeness of the question of guilt]; *People* v. *Woodard* (1979) 23 Cal.3d 329, 341 [152 Cal.Rptr. 536, 590 P.2d 391] [stating that jury deliberations of almost six hours were an indication that the issue of guilt was not "open and shut"].)

Second, the verdict plainly turned on whether or not Powell's testimony was believed. As prosecutor Pippin himself admitted to the court during pretrial proceedings—and in spite of comments to the contrary in closing argument—"[Powell's] credibility is what this case is going to be all about." And as the trial judge observed in ruling on petitioner's motion for judgment of acquittal at the close of the prosecution's case: "[T]he People are relying on the murderer [i.e., Powell] as their chief tie-down witness. If [the jurors] don't believe him, they are not going to convict [petitioner]."

Third, the testimony that Riley, Wallace, and Gross would each have given was of not insignificant persuasive force, consistent as it was with itself and generally with the facts of the case. Moreover, if believed by the jury, it would have completely destroyed Powell's credibility.

The Attorney General claims in substance that the testimony of Riley, Wallace, and Gross is not worthy of consideration. He directs our attention to Crake v. Martin (San Diego Super. Ct. No. 482172), in which Crake's widow and daughter sued petitioner, Powell, and others for damages arising from the alleged wrongful death of Crake. In that case, a jury—having heard testimony of Riley, Wallace, and Gross—returned verdicts in favor of the plaintiffs and against petitioner and Powell. We cannot accept the Attorney General's point. That the testimony may not have prevented civil plaintiffs from carrying their preponderance-of-the-evidence burden does not render that testimony unworthy of consideration—and certainly does not establish that it is insufficient to prevent the People from meeting their burden of proof beyond a reasonable doubt.

In view of the foregoing, we are of the opinion that in the absence of the prosecution's violation of petitioner's constitutional right to present the testimony of witnesses at trial, an outcome more favorable to the defense was reasonably probable.[11]

In conclusion, we hold that petitioner has established his claim to relief on the ground of prosecutorial interference with his constitutional right to present the testimony of Charles Riley, Eugene Wallace, and John Gross.[12]

## C. *Disposition*

Petitioner contends that in view of the prosecutorial misconduct committed in this case he is entitled not simply to the vacation of the judgment of conviction but also to a dismissal of the charges and a bar to reprosecution.

---

[11] Because of the result we reach, we need not address petitioner's contention that the violation of his state constitutional right to compulsory process is prejudicial per se.

[12] Because of this result, we decline to address petitioner's contention that he is entitled to habeas corpus relief on the ground the prosecution introduced false evidence against him at trial.

■ It is the general rule that even when on habeas corpus it is determined that the judgment is void, the petitioner is nevertheless subject to retrial unless he has effectively been acquitted of the offense in question. (*In re McCoy* (1948) 32 Cal.2d 73, 77 [194 P.2d 531].) As we shall explain, petitioner does not establish that the rule is not applicable here.

Petitioner first claims that the constitutional guarantee against double jeopardy entitles him to dismissal. The point must be rejected. The Fifth Amendment to the United States Constitution provides in relevant part that "No person . . . shall . . . be subject for the same offense to be twice put in jeopardy of life or limb . . . ." This provision is made applicable to the states through the due process clause of the Fourteenth Amendment. (*Benton* v. *Maryland* (1969) 395 U.S. 784, 793-796 [23 L.Ed.2d 707, 715-717, 89 S.Ct. 2056].)

■ The United States Supreme Court "has consistently held that the double jeopardy clause imposes no limitation upon the power of the government to retry a defendant who has succeeded in persuading a court to set his conviction aside, unless the conviction has been reversed because of the insufficiency of the evidence." (*Oregon* v. *Kennedy* (1982) 456 U.S. 667, 676, fn. 6 [72 L.Ed.2d 416, 425, 102 S.Ct. 2083].)

Petitioner argues that the prosecutorial misconduct in this case raises a double-jeopardy bar to reprosecution. Specifically, he first derives a general "rule" from *Oregon* v. *Kennedy, supra,* 456 U.S. 667—in which the court considered the question when does the double jeopardy clause bar retrial after a defendant's successful motion for mistrial based on prosecutorial misconduct—to the following effect: the double jeopardy clause bars reprosecution when the prosecution " 'intended . . . to subject [the] defendant[ ] to the substantial burdens imposed by multiple prosecutions' " (*id*. at p. 674 [72 L.Ed.2d at p. 423]), or, in other words, "inten[ded] . . . to subvert the protections afforded by the Double Jeopardy Clause" (*id*. at p. 676 [72 L.Ed.2d at p. 424]). He then asserts that under this "rule" retrial is barred in this case.

Even if petitioner's rule is sound, its application to the facts of this case does not lead to the result he seeks. The referee did not find, nor do the facts establish, that the prosecution as an entity or any of its agents acted with the requisite intent. We do not overlook, less still condone, the serious misconduct that occurred here. But from the evidence in the record we are able to infer, as did the referee implicitly, that the prosecution acted as it did out of a desire to insure that a man whom it sincerely believed to be guilty was convicted at all costs—and not in order to " 'subject [petitioner] to the substantial burdens imposed by multiple procecutions' " (*Oregon* v. *Kenne-*

*dy, supra,* 456 U.S. at p. 674 [72 L.Ed.2d at p. 423]) or to "subvert the protections afforded by the Double Jeopardy Clause" (*id.* at p. 676 [72 L.Ed.2d at p. 424]).

Petitioner maintains that even if the federal double jeopardy clause does not bar retrial in this case, the state double jeopardy clause (Cal.Const., art. I, § 15) does. Specifically, he derives a general "rule" from Justice Stevens's concurring opinion in *Kennedy,* to the effect that the double jeopardy clause bars retrial when the prosecution "engage[s] in 'overreaching' or 'harassment'" (456 U.S. at p. 683 [72 L.Ed.2d at p. 429]), i.e., misconduct that amounts to the "intentional manipulation of the defendant's double jeopardy interests" (*id.* at p. 690 [72 L.Ed.2d at p. 434] [conc. opn. of Stevens, J.]). He then claims that this "rule" constitutes the proper test for implementing the independent state constitutional guarantee against double jeopardy. Finally, he concludes that under this "rule" retrial is barred in this case.

Even if the "rule" is sound and constitutes the proper test for implementing the independent state constitutional guarantee, its application to the facts of this case does not result in the outcome petitioner seeks. As we have stated above, although petitioner has clearly demonstrated that the prosecution engaged in prejudicial misconduct at his trial, he has simply failed to show that it "intentional[ly] manipulat[ed] . . . [his] double jeopardy interests . . . ." (*Oregon* v. *Kennedy, supra,* 465 U.S. at p. 690 [72 L.Ed.2d at p. 434] [conc. opn. of Stevens, J.].)

Petitioner's next major claim is that prosecutorial misconduct violated each of several constitutional rights and therefore warrants a dismissal. He first asserts that his right to a speedy trial was violated. On a superficial view at least, it appears plain that although he did not receive a fair trial he did indeed receive a speedy trial. In any event, he fails to show that dismissal would be justified on the facts of this case. In each of the cases on which he relies—*United States* v. *Heath* (9th Cir. 1958) 260 F.2d 623, and *United States* v. *Seafarers International U. of No. Amer.* (E.D.N.Y. 1972) 343 F.Supp. 779—the court justified dismissal at least in part on the ground that the prosecutorial action in question prejudiced the defense by undermining the defendant's ability to mount a defense. (*Heath,* at pp. 626-632; *Seafarer's International Union,* at p. 791.) Here, by contrast, no such prejudice appears or is even alleged.

Petitioner next asserts that his right to counsel was violated. Although he apparently means to argue that the prosecution somehow interfered in his attorney-client relationship, he does not allege with sufficient clarity the nature of such interference, less still prove that any such interference took place. Be that as it may, he simply fails to show that dismissal is warranted

here. *Barber* v. *Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818], on which he relies, is inapposite: in that case, a governmental agent's intrusion by trickery into confidential attorney-client conferences justified dismissal; in this case, no such—or even similar—intrusion appears.

Lastly, petitioner asserts that his right to due process was violated. For purposes of argument only, we shall assume that the prosecution's misconduct did amount to a constitutional violation. Petitioner then proceeds to argue for dismissal on the basis of dicta in the entrapment cases of *United States* v. *Russell* (1973) 411 U.S. 423 [36 L.Ed.2d 366, 93 S.Ct. 1637], and *People* v. *McIntire* (1979) 23 Cal.3d 742 [153 Cal.Rptr. 237, 591 P.2d 527], to the effect that "the conduct of law enforcement agents [might be] so outrageous that due process principles would absolutely bar the government from involving judicial processes to obtain a conviction" (*Russell,* at pp. 431-432 [36 L.Ed.2d at p. 373]), and that "sufficiently gross police misconduct could conceivably lead to a finding that conviction of the accused would violate his constitutional right to due process of the law" (*McIntire,* at p. 748, fn. 1). But petitioner fails to establish that the prosecutorial misconduct that occurred here, although undeniably serious, was sufficiently "outrageous" or "gross" to justify the relief he seeks.

Petitioner's final claim is that dismissal is appropriate under Penal Code section 1385, which provides in relevant part that "The judge or magistrate may, either on his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed."

It is unclear whether the statutory provision authorizes an appellate court to order an action dismissed. By its very terms it seems to refer to trial judges, and not to appellate courts or to the judges who sit on those courts. Moreover, it is generally so understood. (See Witkin, Cal. Criminal Procedure (1963) § 302, p. 296 [stating that the purpose and result of Pen. Code, § 1385, giving the judge the authority to dismiss, and Pen. Code, § 1386, abolishing the district attorney's power to enter a nolle prosequi, "is to place the power to 'discontinue or abandon a prosecution' [citation] in the *trial judge*" (italics added)].) Finally, as far as our research has been able to determine the provision has never been held to refer to appellate courts.

Even if we are authorized to dismiss under Penal Code section 1385, we would not exercise that power in this case. Petitioner rests his claim to relief, in large part, on the presence of gross prosecutorial misconduct. But, as we have stated, the misconduct in this case, although certainly serious, was not gross.

### III. CONCLUSION

For the foregoing reasons we conclude that the petition for writ of habeas corpus must be granted and hence that the judgment must be vacated.

The petition for writ of habeas corpus is granted. The judgment is vacated and petitioner is remanded to the Superior Court of San Diego County. Upon finality, the clerk shall remit a certified copy of this opinion and order to the superior court for filing, and respondent shall serve another copy thereof on the prosecuting attorney in conformity with Penal Code section 1382, subdivision 2. (*In re Hall, supra,* 30 Cal.3d at p. 435, fn. 9)

Lucas, C. J., Broussard, J., Panelli, J., Arguelles, J. Eagleson, J., and Kaufman, J., concurred.