Filed 12/7/21  P. v. Green CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).    This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>MIA MONEE GREEN,<br><br>　　　Defendant and Appellant. | B307194<br><br>(Los Angeles County<br>　Super. Ct. No. BA457021) |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County.  Lisa B. Lench, Judge.  Affirmed.

　　　　Spolin Law and Aaron Spolin for Defendant and Appellant.

　　　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Roberta L. Davis and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

　　　　　　　　* * * * * * * * * *

Defendant and appellant Mia Monee Green was sentenced to 11 years in prison after a jury found her guilty of participating in several burglaries and a home invasion robbery in the spring of 2014. Defendant raises two claims of error warranting a new trial. She says the prosecutor committed prejudicial misconduct that resulted in a key percipient witness being unavailable to testify, and there was insufficient evidence corroborating the accomplice testimony of Wasani Davis, who provided the only direct evidence of her connection to the crimes.

We are not persuaded by either contention and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged, along with four codefendants (Denzel Washington, Mondray Montgomery, Sidney Wilson and Wasani Davis), with multiple felonies arising from a home invasion robbery and a series of burglaries that took place in May and June 2014 in Beverly Hills and west Los Angeles. None of the codefendants is a party to this appeal.

At the time of the joint jury trial in September 2018, the case against defendant included 15 felony counts: attempted murder (Pen. Code, §§ 187, subd. (a), 664; count 1); aggravated mayhem (§ 205; count 2); two counts of torture (§ 206; counts 3 & 4); two counts of home invasion robbery (§ 211; counts 5 & 6); four counts of first degree residential burglary (§ 459; counts 7, 11, 12 & 13); two counts of assault with a firearm (§ 245, subd. (a)(2); counts 8 & 9); two counts of conspiracy to commit a crime (§ 182, subd. (a)(1); counts 10 & 41); and kidnapping for ransom (§ 209, subd. (a); count 21). Gang and firearm use allegations were also alleged.

2

The jury found defendant guilty on counts 3 through 8, 10, 12, 13 and 41.  On counts 2 and 9, the jury found defendant guilty of a lesser included charge (misdemeanor battery and misdemeanor assault, respectively).  The jury acquitted defendant on counts 1 and 11 and found not true the gang allegations.  The jury found true the allegation a principal used a firearm in connection with counts 3, 5, 7, 8 and 41. Before the jury began deliberations, the court granted defendant's motion for a judgment of acquittal on count 21. The court also granted defendant's motion for new trial as to counts 3 and 4.  The prosecution declined to proceed, and those counts were dismissed.

Defendant was sentenced to 11 years in prison and received 862 days of presentence custody credits.

We summarize the material trial evidence pertaining only to the counts for which defendant was convicted and that are relevant to this appeal.

## 1.    Testimony of Accomplice Wasani Davis

Davis testified against his codefendants pursuant to a plea agreement in which he received leniency in sentencing.

Davis was released from jail on an unrelated charge in the spring of 2014 and was wearing a GPS tracking device on his ankle as a bail condition.  Davis was a member of the Rollin 20 Outlaws street gang, as was codefendant Wilson.  The Rollin 20's gang was friendly with the Black P-Stones, another street gang operating nearby.  Davis met defendant and codefendant Washington, a member of the Black P-Stones, through another gang member.  Davis did not know codefendant Montgomery.

Around noon on May 30, 2014, Washington and defendant went to Davis's girlfriend's house to talk to Davis.  Washington told Davis they were planning home invasion robberies.

Washington said they were targeting Asian and Jewish homes because they did not believe in banks and would have a lot of valuables and cash at home. They were going to dress in "jumpsuits" to do the job. Washington also told him that defendant, and sometimes her mother, were renting rental cars to use on different jobs.

In early June, defendant and Washington picked up Davis in a white Dodge Charger (defendant was driving), and they drove around together "scoping" locations to burglarize. About a week later, Davis, Wilson, Washington and defendant went out to burglarize some of the homes in the neighborhoods they had checked out earlier. Defendant drove the white Dodge Charger to the various locations, Washington sat in the front passenger seat, and Davis and Wilson were in the backseat.

Davis was still wearing his GPS ankle tracking device, but the others did not know it.

On June 16, 2014, Davis and Washington burglarized a home on South Mansfield Avenue in Los Angeles (later identified as the home of Michael Holmes). Wilson and defendant stayed in the car while he and Washington went inside. They took money, watches and other "valuables" worth several thousand dollars. Davis recalled that Washington also grabbed some Louis Vuitton luggage.

Two days later, defendant and Washington picked up Davis again in the same white Charger. Like before, defendant was driving, Washington was in the front passenger seat, and Davis and Wilson sat in the back. They went to three or four houses in Beverly Hills.

At one home that had an alley behind it (later identified as the home of Gidon Rosman), Davis, Washington and Wilson went

inside while defendant waited in the Charger in the alley. Shortly after they got inside the house, defendant called to warn them the police were on their way and they needed to leave. Davis explained one "technique" they regularly used was monitoring activity on a police scanner. After getting the call from defendant, all three ran back to where defendant was waiting for them and jumped into the car. Washington got in to drive, and defendant moved over to the passenger seat. As they were turning out of the alley, Davis noticed a car following them. Because the car was unmarked, they did not realize it was a police officer pursuing them. Davis thought a "good Samaritan" was chasing them. Washington sped up and was able to lose the car. Davis threw his hat and gloves out the window as they drove off.

After eluding the unmarked police car, Washington drove to another house near the UCLA campus where they attempted another burglary. Davis, Washington and Wilson went inside, and defendant once again stayed in the Charger waiting for them to make their escape. They found a safe in the house and, while breaking into it, the door slammed shut on Davis's finger and cut off the tip. They fled the house, taking the safe with them. Washington drove to a garage (later identified as the garage located on West 39th Street), where a friend of theirs opened the safe and recovered the tip of Davis's finger. Davis said there were two police scanners in the garage and lots of tools. He went to the hospital afterward but medical staff were unable to reattach the tip of his finger.

Davis was initially reluctant to be a snitch, and he admitted he lied to the police about numerous things in his initial discussions with them. But after speaking with his daughter,

Davis agreed to plead guilty and testify against his codefendants. He denied he was lying about defendant's involvement in the crimes.

## 2. The Nonaccomplice Testimony

### a. May 30, 2014

Samuel and Diana Hirt testified they were at their home on Doheny Road in Beverly Hills on the evening of May 30, 2014. They had hosted a prayer service, and the last of their guests and the rabbi had just left. They both recalled there was a knock at the door, and they assumed it was one of their guests who had forgotten something and returned to collect it. When Mr. Hirt, who was 80 years old at the time, answered the door, three men entered and forcefully knocked him to the ground. His head struck the marble flooring. The three men were dressed the same, wearing gloves and shirts with the word "security" on it. Mr. Hirt was punched repeatedly in the face, and his hands and feet were bound with plastic zip ties. He was dragged into another room. Mrs. Hirt feared her husband would be killed.

Mrs. Hirt, who was in her 70's at the time, had a gun pointed directly at her. She tried to remain calm, and when they demanded money, she told them there was no money in the house but they could have her jewelry. Mrs. Hirt's hands and feet were bound, and she was shot in the leg. She was dragged into the master closet where she explained where the key to her jewelry box and the box were located. All of her jewelry was taken, including her two-carat diamond wedding ring. After the men left the house around 8:30 p.m., her husband was able to free himself, and they called 911. Mr. Hirt suffered permanent injuries from the beating he received, and Mrs. Hirt was

6

bedridden for several months recovering from the gunshot wound to her leg.

**b.    June 16, 2014**

Michael Holmes lived on South Mansfield Avenue in Los Angeles in June 2014.  While at work, he received a notification from his security system there was something going on at his home.  On a remote stream from his security cameras, he could see someone entering his house, so he left work immediately.  When he arrived home, he found a window shattered and the house vandalized.  His Louis Vuitton luggage was missing, as were several electronic items and football memorabilia worth "tens of thousands of dollars."

**c.    June 18, 2014**

Judi Grushcow lived on South Almont Drive in Beverly Hills.  On the afternoon of June 18, 2014, she and her husband received a call from their home security company about an intrusion at their home.  When they returned home, Mrs. Grushcow and her husband found the front door open, the back slider broken, and the home ransacked.  Despite the damage, they determined that nothing was taken.

Beverly Hills Police Officer Andrew Myers responded to the burglary alarm at the Grushcow home.  Officer Myers saw the damage to the doors of the home, which had clearly been forced open.  A neighbor, Lior Miles, approached Officer Myers and showed him a photograph she had taken.  He took a witness statement from her.

That same afternoon, Melody Termechi was walking her dogs on South Maple Drive in Beverly Hills.  An African-American male wearing black clothes and a black hat walked past her on the sidewalk.  Her attention was distracted for a

while by her dogs but when she looked up again, she saw the same man coming out of one of her neighbor's homes, which seemed odd to her because she knew he did not live there. She also noticed a Dodge Charger with Massachusetts license plates parked across the street from the home.

Beverly Hills Police Officer Jeffrey Newman responded to the suspicious person report on South Maple Drive. Officer Newman was working a plain clothes detail that afternoon and was patrolling the area in an unmarked car looking for potential burglaries in progress. When he arrived at South Maple Drive, Officer Newman saw a white Dodge Charger with Massachusetts license plates coming out of the alley that runs behind the homes on Maple Drive. The Charger had tinted windows so he could not see inside the car. Officer Newman followed the Charger which sped off after leaving the alley. Gloves and a hat were thrown from the car. Officer Newman radioed for another officer to retrieve the items while he continued his pursuit. Officer Newman eventually lost sight of the Charger in traffic. The gloves were recovered.

Gidon Rosman lived on South Maple Drive and owned the home where the burglary occurred. He drove home in response to a call from the police notifying him of the break in. When he arrived at home, the back door was open, there was evidence of damage and ransacking in the kitchen, and his computer and some jewelry were missing. Footage from his home security cameras showed several African-American males on his driveway, in the backyard and entering his home. The footage was turned over to the police.

### d. Other evidence

Officer Michelle Smith testified she stopped defendant for a traffic stop in early May 2014. During the encounter, defendant told Officer Smith her address and her cell phone number which ended with -9727.

Detective Mark Schwartz of the Beverly Hills Police Department testified that in the spring of 2014, the city was experiencing an uptick in what they referred to as "knock-knock burglaries." The term referred to a "certain pattern" of how individuals were gaining access to homes and committing burglaries or robberies. The department had created a temporary plain clothes unit to do additional patrols to respond to the rise in those crimes.

On July 8, 2014, Detective Schwartz received information from the Los Angeles Police Department about Davis as a possible suspect in his investigation. From his interview with Davis and viewing the data from his GPS tracking device, Detective Schwartz discovered the garage located on West 39th Street in Los Angeles. After surveillance was performed, a search warrant was obtained and various items were recovered from the garage, including two police scanners, tools, weapons, a cell phone ending -2071 that had defendant's and Washington's phone numbers saved in the contacts list, and a motorcycle suspected as having been used in some of the burglaries.

On July 9, 2014, Washington was arrested in connection with the June 16 burglary. Defendant was with Washington when he was detained. He asked the arresting officers to give the keys to the Dodge Charger to defendant whom he referred to as his "fiancé[e]." Defendant accepted the keys to the car. Washington admitted burglarizing the South Mansfield Avenue

home with Davis on June 16, 2014. He acknowledged his image in a photograph leaving the house carrying Louis Vuitton luggage.

Cell phone records for various cell phones were admitted, including records pertaining to the phone registered in defendant's name (-9727), the phone found at the garage (-2071), and phones attributed to Washington (-6876), Wilson (-5105), and Montgomery (-3839).

Analysis of those records showed that on May 30, 2014, the cell phones attributed to defendant, Washington, Montgomery and the one ending -2071 were pinging off the cell tower near Doheny Road in Beverly Hills from 12:30 p.m. through 8:30 p.m., and then were pinging off the cell tower near the West 39th Street garage. On June 16, 2014, the same phones and also Wilson's phone were pinging off the cell tower near South Mansfield Avenue and then later near the West 39th Street garage. On June 18, 2014, those same five phones were pinging off the cell towers near South Maple and South Almont in Beverly Hills and then off the tower near the West 39th Street garage.

Bruce Derrick testified about the GPS tracking device that Davis was wearing as a condition of his bail. The device issued a location notification every five minutes and was generally accurate to within 20 feet. The device did not show any signs of being tampered with between May 30 and June 18, 2014. The tracking system showed Davis was at the South Mansfield address on June 16, and at the South Almont and Maple Drive locations on June 18, 2014, and later that day he was near the West 39th Street location. The tracking system also showed Davis was not at the Doheny Road address on May 30, 2014.

The manager of the Hertz rental car agency at Los Angeles International airport testified that a white Dodge Charger with Massachusetts license plates was rented by a "Kenya Robinson" (defendant's mother) on June 11, 2014, and exchanged for a gray Dodge Charger on June 19, 2014.

### 3.    Defense Evidence

Evelyn Riley, a friend of defendant's, testified defendant was with her on May 30, 2014, between 8:30 p.m. and midnight at a birthday party for one of their friends.  She had not realized the significance of the date, nor come forward earlier, until she had a conversation with defendant's mother, Kenya Robinson, about a month before trial.

Cynthia Rivera was the office manager at a dental office where defendant worked as a dental assistant.  She said that to the best of her recollection, defendant worked every day in May and June 2014.  The office was closed on Mondays, closed at 5:00 p.m. on Tuesdays, closed at noon on Thursdays and closed at 2:30 p.m. on Wednesdays and Fridays.  On cross-examination, Ms. Rivera said she did not have a specific recollection of where defendant was on any date in May or June 2014, but she was the only dental assistant, and Ms. Rivera did not recall having to cancel patients due to defendant not coming to work during that period.

Ms. Rivera also testified she recalled that defendant always had her cell phone with her.

## DISCUSSION

### 1.    There Was No Prosecutorial Misconduct Interfering With Defendant's Right to Present Witnesses

Defendant contends the prosecutor committed misconduct by interfering with her constitutional right to present witnesses

in her defense.  (See, e.g., *In re Martin* (1987) 44 Cal.3d 1, 30 [Sixth Amendment right to compulsory process violated when government substantially interferes with exercise of an accused's right to present witnesses].)

"To prevail on a claim of prosecutorial violation of the right to compulsory process, a defendant must establish three elements." (*People v. Jacinto* (2010) 49 Cal.4th 263, 269 (*Jacinto*); accord, *In re Martin*, *supra*, 44 Cal.3d at pp. 30-32.)

First, the defendant must show the prosecutor engaged in conduct that was " ' " 'entirely unnecessary to the proper performance of the prosecutor's duties and was of such a nature as to transform' " ' " a willing witness into an unwilling one. (*Jacinto*, *supra*, 49 Cal.4th at p. 269.)  Examples of such misconduct include, but are not limited to, threatening a defense witness with a perjury prosecution or making a defense witness unavailable by arranging for their deportation.  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 52 (*Coffman and Marlow*).)

Second, the defendant must establish the misconduct was " 'a substantial cause in depriving the defendant of the witness's testimony.' " (*Jacinto*, *supra*, 49 Cal.4th at p. 269; accord, *In re Martin*, *supra*, 44 Cal.3d at p. 31.)  The defendant need not show the misconduct was the exclusive cause, only that it was " 'a substantial cause.' " (*Jacinto,* at pp. 269-270.)

Finally, the defendant must show the testimony of the witness " 'would have been both material and favorable to his defense.' " (*In re Martin*, *supra*, 44 Cal.3d at p. 32; accord, *Jacinto*, *supra*, 49 Cal.4th at p. 272.)

Here, the witness that was unavailable to testify was Lior Miles, a neighbor of one of the homes burglarized in Beverly Hills

12

on June 18, 2014. She reported she had seen, from her bathroom window, five African-American males walking down the street who seemed to be acting suspiciously. She took a picture from her bathroom window and gave it to the police. She did not see anything else. Detective George Elwell later described the photograph she provided as showing a white Dodge Charger parked at the curb, but the windows were dark, possibly tinted, and it was not possible to make out any individuals in the photo.

Defendant says the misconduct occurred when Detective Mark Schwartz, acting on behalf of the prosecutor, told Ms. Miles she did not have to speak to defense counsel and implied she would be in danger if she testified at trial by reminding her the defendants were violent and had brutally attacked an elderly couple. There is no evidence in the record to support this contention.

The email conversation between Detective Schwartz and Ms. Miles shows that in February 2018, some seven months before trial and almost four years after the incident, Ms. Miles was in Israel and did not have plans to return to the United States. She also expressed a reluctance to testify, claiming it had been years since it happened, and she had not seen much from her bathroom window anyway. She concluded her email by saying she was willing to help via email but "I cannot fly back to the states."

Detective Schwartz responded by asking Ms. Miles to "please" contact the prosecutor, providing relevant contact information. He then said he wanted to remind her the case involved violence against an elderly couple and that her involvement, "albeit is small," it was still important. Detective Schwartz concluded with, "I ask that you at least communicate

13

with the District Attorney.  They will fly you out if necessary."
This email conversation was forwarded to the prosecutor and
defense counsel in February 2018.  Ms. Miles remained in Israel
in September 2018 when the case went to trial.

We do not agree with defendant's characterization of the
email as an effort by Detective Schwartz to frighten and
intimidate the witness.  To the contrary, it seems plain the
detective mentioned the violence of the crimes to underscore this
was a serious case, and the witness's participation was therefore
important, no matter how insignificant she viewed her own
testimony.  It seems equally clear Ms. Miles had already made up
her mind she was not going to return from overseas to testify.
There is nothing to indicate Detective Schwartz was responsible
for her reluctance to return to the United States.  (*Coffman and
Marlow*, *supra*, 34 Cal.4th at p. 52 ["that a witness is reluctant to
assist one side or the other of a criminal prosecution" is not
"unusual and does not, in itself, support a claim that the
prosecution interfered with a defendant's right of compulsory
process"].)

Detective Schwartz admitted he told Ms. Miles she was not
obligated to speak to defense counsel.  But merely telling a
witness she is not legally obligated to speak to defense counsel
does not amount to prosecutorial misconduct.  (*Coffman and
Marlow*, *supra*, 34 Cal.4th at p. 52.)

Defendant also did not demonstrate the materiality of
Ms. Miles's testimony.  Defendant says Ms. Miles's testimony was
important because Ms. Miles said she saw only men walking
down the street, not a woman—testimony that would have
supported defendant's alibi she was not present.  But the
evidence in the case was that defendant's main role in the crimes

14

was as the getaway driver and lookout who remained in the car while the others committed the burglaries, so the fact Ms. Miles did not see a woman on the street was not significant.  Moreover, Detective Elwell's description of the photograph Ms. Miles took indicated it was not of much value, other than showing that a white Dodge Charger was present at the scene.

2.    **There Was Sufficient Corroboration of Davis's Testimony**

Defendant contends the only direct evidence of her involvement in the burglaries and home invasion robbery is the accomplice testimony of Wasani Davis and that his testimony was not corroborated by independent evidence as required by Penal Code section 1111 ("A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense").  We disagree.

It is well established that " '[c]orroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone.  [Citations.]  It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified.  [Citations.]  It is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." [Citation.]' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 95 (*Manibusan*); accord, *People v. Williams* (1997) 16 Cal.4th 635, 680-681.)

" 'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not

15

reasonably tend to connect the defendant with the commission of the crime.'" (*People v. Abilez* (2007) 41 Cal.4th 472, 505 (*Abilez*).)

Defendant does not contend the corroborating evidence was inadmissible. She argues *only* that it is insufficient to connect her to the commission of the crimes, saying that at best it shows her cell phone was in the vicinity of where the crimes took place but nothing more.

Defendant's minimization of the cell phone evidence seems to suggest she believes corroborating evidence must meet the substantial evidence standard. But that is *not* the standard. (*Manibusan, supra,* 58 Cal.4th at p. 95; *Abilez, supra,* 41 Cal.4th at p. 505 ["to the extent defendant argues that evidence corroborating [the accomplice's] testimony must be substantial, he is mistaken"].)

The cell phone evidence was solid circumstantial evidence connecting defendant to the conspiracy to burglarize homes and corroborated Davis's testimony that defendant's main involvement in the crimes was serving as the getaway driver and lookout. The evidence showed defendant's cell phone in the vicinity of each of the locations where the crimes occurred on May 30, June 16 and June 18, 2014, during the relevant time periods. The cell phone records also showed calls between the defendants during the time period before, during and after the crimes. The reasonable inference from such evidence was that defendant, with her cell phone in her possession, was with her coconspirators and assisting in their crimes. One of defendant's own witnesses testified defendant was never without her phone.

Moreover, there was testimony from a Hertz employee that a white Dodge Charger with Massachusetts license plates was rented in the name of defendant's mother in early June 2014 and

returned on June 19, 2014, the day after the last burglary. This evidence provided corroboration of Davis's testimony that defendant, sometimes with the assistance of her mother, rented cars for use in committing the burglaries—evidence that was further bolstered by the witness testimony that a white Dodge Charger with Massachusetts license plates was seen at most of the June 2014 burglary locations.

Finally, so long as there is independent corroborating evidence that connects the defendant to the crime, as there was here, a jury may also rely on other evidence that corroborates details about the crime generally. Such additional corroboration forms "part of a picture indicating the jury may be satisfied that the accomplice is telling the truth." (*People v. Pedroza* (2014) 231 Cal.App.4th 635, 659.) There was substantial corroboration of the balance of Davis's testimony about how the conspiracy operated and how the crimes occurred that lent credence to his testimony, notwithstanding his admissions that he had not been entirely truthful in his initial interviews with the police.

### DISPOSITION

The judgment of conviction is affirmed.


GRIMES, Acting P. J.


WE CONCUR:


STRATTON, J.        HARUTUNIAN, J.*

---

*        Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17